**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SERGEY G. NOVITSKY,

      Plaintiff-Appellant,

v.

CITY OF AURORA, MICHAEL
WORTHAM, and PAUL
MARSHALL,

      Defendants-Appellees.

No. 05-1169

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 03-M-1045-OES)

---

Brice A. Tondre, Denver, Colorado, for Plaintiff-Appellant.

Michael T. Lowe (with Marc F. Colin on the briefs), Bruno Bruno & Colin, Denver, Colorado, and Peter R. Morales, Aurora City Attorney's Office, Aurora, Colorado, for the Defendants-Appellees.

---

Before **TACHA,** Chief Circuit Judge, **McKAY**, and **HENRY**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

      This 42 U.S.C. § 1983 action arises out of an encounter between Sergey

Novitsky and City of Aurora, Colorado police officers Michael Wortham and

Paul Marshall. While responding to a "man down" call, the officers discovered Mr. Novitsky lying in the fetal position in the backseat of a parked vehicle. When Mr. Novitsky was exiting the vehicle, Officer Wortham grasped his hand in an arrest control technique known as a "twist lock," and, almost immediately, observed a handgun in Mr. Novitsky's front right pants pocket. After confiscating the handgun and issuing a municipal summons, the officers released Mr. Novitsky. In a subsequent report detailing their encounter, Officer Wortham stated that he applied the twist lock to Mr. Novitsky *after* seeing the handgun.

Mr. Novitsky was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and bound over for trial. He filed a motion to suppress the handgun. Relying on the hearsay testimony of a Bureau of Alcohol and Firearms agent (who testified, based in part on Officer Wortham's report, that Officer Wortham applied the twist lock *after* seeing the handgun), the district court denied Mr. Novitsky's motion. However, after Officer Wortham testified at trial that he applied the twist lock *before* he observed the handgun, the district court declared a mistrial and held a second motion to suppress hearing. After the hearing, the district court suppressed the handgun. We affirmed the district court's ruling, see United States v. Novitsky, 58 Fed. Appx. 432 (10th Cir. 2003), and the government dismissed the indictment.

Mr. Novitsky then filed this § 1983 action against both officers and the

City of Aurora (the "City"). He asserted (1) the officers unreasonably seized him in violation of the Fourth Amendment by using the twist lock to remove him from the vehicle; (2) the officers caused the federal criminal prosecution and his resulting incarceration in violation of the Fourth and Fourteenth Amendments; and (3) the City maintained an unconstitutional policy under which its officers applied the twist lock and conducted pat-down searches without any evidence of a crime or threat to officer safety.

The district court entered summary judgment in favor of the officers and the City. We have jurisdiction pursuant to 28 U.S.C. § 1291 and, for the reasons that follow, affirm.

## I. BACKGROUND

### A. MR. NOVITSKY'S ENCOUNTER WITH THE OFFICERS

Shortly before 2:00 p.m. on June 9, 2001, Officers Wortham and Marshall received a "man down" call regarding an unconscious man in the front seat of a vehicle located in a YMCA parking lot. The officers arrived at the scene and observed a man's legs hanging out of the open front passenger door of a parked vehicle. As they approached, the officers noticed another man, later identified as Mr. Novitsky, who "appeared to be sleeping or passed out" in the vehicle's back seat. Aplt's App. at 131.

While Officer Marshall remained near the vehicle's rear passenger door, Officer Wortham roused the man in the front seat, who smelled of alcohol. When

-3-

Officer Wortham asked him to exit the vehicle, the man slurred his speech and had difficulty standing. Officer Wortham assisted him out of the vehicle, frisked him, and sat him down on the pavement in front of the vehicle.

Officer Wortham then awoke Mr. Novitsky by knocking on the window and directed him to get out of the vehicle. Although Mr. Novitsky appeared "a little dazed" and the car smelled of alcohol, id., Officer Wortham did not know whether Mr. Novitsky was in fact intoxicated.

When he reached up with his right hand as though to grab onto the door and help himself out, Officer Wortham grasped Mr. Novitsky's hand in a "twist lock." As described by Officer Wortham, this technique involves an officer grabbing an individual by the hand and twisting to tighten up the arm. If an individual begins to fight or resist, the officer twists the arm further. "[T]he twist [lock] divides the individual's attention: the mind starts thinking about the pain in the arm instead of what they are going for or what they are doing . . . that way you can basically distract them and get them out of the vehicle without having further problems. Once the twist [lock] is applied, a person would not be able to walk away." Novitsky, 58 Fed. Appx. at 434 (alterations and internal quotation marks omitted). Because Mr. Novitsky did not resist, Officer Wortham did not apply pressure beyond the basic twist-lock position.

As Officer Wortham began to turn Mr. Novitsky around to perform a pat-down search, he immediately observed a handgun in Mr. Novitsky's front

right pants pocket. Officer Wortham yelled "gun," and Mr. Novitsky exclaimed, "It's a toy, it's a toy." Id. at 43. Officer Wortham removed a loaded Smith & Wesson .44 caliber pistol from Mr. Novitsky's pocket.

After placing Mr. Novitsky in handcuffs, the officers transported him to a detox center. Because Mr. Novitsky was not intoxicated, Officer Wortham issued a municipal summons and released him. Afterward, Officer Wortham filed a Serialized Property Report and placed the confiscated firearm into evidence at the Aurora Police Department. In the report, Officer Wortham described the sequence of events leading to his discovery of the firearm as follows:

> As [Mr. Novitsky] was getting out I could see a handgun in his right front pants pocket. I quickly grabbed his right hand into a twist lock . . .

Aplt's App. at 146.

B. FEDERAL INVESTIGATION

The Bureau of Alcohol, Tobacco and Firearms ("BATF") traces all firearms entered into evidence at the Aurora Police Department. Consequently, a BATF agent traced the firearm to Mr. Novitsky and began an investigation to determine if Mr. Novitsky's possession of it involved a federal crime. Upon learning that Mr. Novitsky had "four possible felony cases that had been previously filed against him," the agent referred the case to another BATF agent, Manuel Porter, for further investigation. Id. at 187.

Agent Porter interviewed Mr. Novitsky at the Douglas County Jail while

Mr. Novitsky was being held there on unrelated charges. During the interview, Mr. Novitsky signed an affidavit in which he admitted to possessing the firearm and having a prior felony fraud conviction. Agent Porter then gathered the information from his investigation, including copies of the municipal summons and the Serialized Property Report, and presented his case file to the U.S. Attorney's Office.

C.     CRIMINAL PROSECUTION

On August 7, 2001, Mr. Novitsky was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and bound over for trial. Prior to trial, Mr. Novitsky filed a motion to suppress the handgun.

1.    The First Motion to Suppress Hearing

In January 2002, the district court held a hearing on the motion to suppress. Neither Officer Marshall nor Officer Wortham was called to testify. Instead, Agent Porter recounted the officers' encounter with Mr. Novitsky based on "Officer Wortham and Officer Marshall's Reports," id. at 119, and a meeting with both officers, id. at 199. After stating that Officer Wortham told him the reports detailed the encounter "exactly as he remembered it," id., Agent Porter testified that Officer Wortham applied the twist lock *after* observing the firearm. The district court denied Mr. Novitsky's motion to suppress.

2.    The Trial

At trial, Officer Wortham testified for the first time. On direct examination, he stated that he applied the twist lock *before* he observed the firearm when Mr. Novitsky "stuck his right arm up and tried to grab for the doorway." Id. at 251. He also testified that he primarily applied the twist lock to "eliminate [Mr. Novitsky's] ability of moving or grabbing anything or that type of thing" for officer safety purposes. Id. In explaining his concern for his safety, Officer Wortham added:

> I am always concerned for my safety because I don't know what I am dealing with. I don't know if he is intoxicated, if he just did commit a crime and is just laying there, so yes, I am concerned for my safety. And it's just standard procedure the way we contact people.

Aple's Supp. App. at 2. He further provided that applying the twist lock was

> [j]ust standard procedure . . . when taking somebody out of a vehicle that's been sleeping or possibly alcohol related just to – just been awakened and just wanted to make sure they didn't make any offensive movements or that type of thing so we would be able to control their movement.

Aplt's App. at 251. After Officer Wortham's testimony, the district court granted a mistrial and called for a reexamination of whether Officer Wortham reasonably applied the twist lock to Mr. Novitsky.

3.   The Second Motion to Suppress Hearing

At a second motion to suppress hearing on May 21, 2002, Officer Wortham again testified. During direct examination, he reiterated that he applied the twist lock prior to seeing the firearm for "officer safety" purposes. Id. at 269. On

-7-

cross-examination, Officer Wortham conceded that Mr. Novitsky neither made furtive movements nor resisted his instruction to exit the vehicle. He also admitted there was no evidence that Mr. Novitsky had committed a crime.

Defense counsel also asked Officer Wortham if the Aurora Police Department instructed its officers to use the twist lock to remove individuals from their vehicles during "routine traffic stops," i.e., when issuing speeding tickets. Id. at 279. Officer Wortham explained he would not use the twist lock under such circumstances:

> If it was a simple traffic [stop], as you just said, I would ask them to step out of the vehicle. If there was some other reason . . . like it came up that [the detained individual] had a warrant or there was something that maybe he was making false statements or he was making furtive movements in the vehicle. . . . [t]hen that's how I would get them, because I want to limit their movement as they come out.

Id. Officer Wortham then explained why he believed using the twist lock on Mr. Novitsky was justified:

> [H]is partner [in the front seat] was intoxicated, so there was a possibility that [Mr. Novitsky] might be intoxicated, so that's why my awareness was heightened and that's when I took him out.

Id. at 280.

Based on Officer Wortham's testimony, Mr. Novitsky argued the application of the twist lock was unreasonable under the Fourth Amendment. In opposition, the government argued that Officer Wortham's use of the twist lock was a reasonable exercise of his "community caretaking functions," *viz.*, those

duties that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973).

On July 1, 2002, the district court granted Mr. Novitsky's motion to suppress. Although it found the officers were reasonably exercising their community caretaking functions in "approaching the car and contacting the occupants to determine whether they were in need of medical help or other assistance," id. at 35, the court concluded Officer Wortham unreasonably applied the twist lock because he did not have any "reason to believe [Mr. Novitsky] was armed or otherwise presented a threat to [the officers'] safety." Id. at 38.

The government appealed. In February 2003, we affirmed the district court's grant of Mr. Novitsky's motion to suppress. See Novitsky, 58 Fed. Appx. at 436. The government then dismissed the indictment, and Mr. Novitsky was released from prison.

D.   MR. NOVITSKY'S CIVIL SUIT

Mr. Novitsky then filed this § 1983 action against Officers Wortham and Marshall and the City, asserting three separate claims.[1] First, he alleged the officers violated his Fourth Amendment rights by using the twist lock to remove him from the vehicle. Second, he alleged the officers caused his prosecution and

---

[1] Mr. Novitsky dismissed a fourth claim on his own motion, and it is not at issue here.

resulting 19-month incarceration in violation of his Fourth and Fourteenth Amendment rights. As discussed below, we view this claim as alleging malicious prosecution. Third, he alleged the City maintained an unconstitutional policy under which its officers applied the twist lock and conducted pat-down searches notwithstanding the absence of any evidence of a crime or threat to officer safety.

After the parties conducted discovery, the officers and the City moved for summary judgment on all of Mr. Novitsky's claims. Mr. Novitsky also moved for partial summary judgment, invoking the doctrine of collateral estoppel and arguing that the rulings of the district court and this court during his criminal case already established the unconstitutionality of the officers' conduct and the existence of an unconstitutional City policy.

The district court denied Mr. Novitsky's motion for partial summary judgment and entered summary judgment in favor of the officers and the City. With regard to Mr. Novitsky's first claim, the district court concluded the officers were entitled to qualified immunity because, on June 9, 2001, they did not violate clearly established law by removing Mr. Novitsky from the vehicle using the twist lock. The court also concluded Mr. Novitsky's allegations were insufficient to show the officers' caused the federal prosecution and Mr. Novitsky's resulting incarceration because "[t]he decision to prosecute was not theirs." Id. at 299. Finally, the court concluded Mr. Novitsky failed to establish the existence of an unconstitutional City policy because the evidence indicated that Officer

Wortham's use of the twist lock "was a matter of discretion, not direction." Id.

This appeal followed.

## II. STANDARD OF REVIEW

We review the district court's summary judgment rulings de novo, using the same standard as the district court, and "may affirm the district court's order on any grounds adequately presented below." Medina v. City & County of Denver, 960 F.2d 1493, 1500 (10th Cir. 1992). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); FED.R.CIV.P. 56(c). A factual dispute is only "genuine" if the evidence and the inferences drawn therefrom, when viewed in the light most favorable to the nonmoving party, are "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Accordingly, we will affirm the district court's entry of summary judgment when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

## III. DISCUSSION

Mr. Novitsky's arguments on appeal are poorly framed and hard to follow. As we see it, he first argues the officers are not entitled to qualified immunity for using the twist lock to remove him from the vehicle. Second, he contends there

-11-

are genuine issues of material fact as to whether the officers caused the federal prosecution and his resulting incarceration. Third, he maintains there is sufficient evidence to create a genuine issue of material fact as to the existence of an unconstitutional City policy. We address these arguments in turn.

## A. THE TWIST LOCK

The district court concluded the officers were entitled to qualified immunity for using the twist lock to remove Mr. Novitsky from the vehicle. "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (internal citations and quotation marks omitted). Consequently, the Supreme Court has emphasized the need to expeditiously resolve "'immunity questions at the earliest possible stage in litigation.'" Id. (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Given the underlying purposes of qualified immunity, we require a plaintiff to satisfy a "heavy two-part burden" to overcome a defendant's summary judgment motion based on qualified immunity. Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotation marks omitted). First, the plaintiff must demonstrate the defendant's actions violated a constitutional right. Saucier, 533 U.S. at 201. Second, the plaintiff must show that the right alleged to be violated

-12-

was clearly established at the time of the conduct at issue.[2]  Id.

1.      Prong One: Constitutional Violation

Mr. Novitsky alleges the officers violated the Fourth Amendment by using the twist lock to remove him from the vehicle.  By its terms, the Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures."  A seizure occurs for Fourth Amendment purposes "whenever a police officer accosts an individual and restrains his freedom to walk away."  Terry v. Ohio, 392 U.S. 1, 16 (1968).  The "reasonableness" of a particular seizure depends on the balance between "the nature and quality of the intrusion on the individual's Fourth Amendment

---

[2]  Mr. Novitsky argues that we need not undertake this two-part test because the district court and this court already ruled in his criminal case that the officers' use of the twist lock violated his constitutional rights.  He thus maintains that the district court erred in denying his motion for partial summary judgment, which invoked the doctrine of collateral estoppel.

We disagree.  Collateral estoppel bars re-litigation of an issue only when: (1) the issue previously decided is identical with the one presented in the instant case; (2) the merits of the prior action have been finally adjudicated; (3) the party against whom the doctrine is invoked was a party or in privity with a party in the prior action; and (4) in the prior action, the party against whom the doctrine is invoked has had a full and fair opportunity to litigate the issue.  Murdock v. Ute Indian Tribe, 975 F.2d 683, 687 (10th Cir. 1992).  As we have previously made clear, a court's conclusion during a criminal prosecution that a law enforcement officer's conduct was unconstitutional is not afforded collateral estoppel effect in a subsequent civil case against the officer because there is no privity between the prosecution in the criminal case and the officer.  See Morgan v. Gertz, 166 F.3d 1307, 1309 (10th Cir. 1999); Kinslow v. Ratzlaff, 158 F.3d 1104, 1105-07 & n.3 (10th Cir. 1998).  Thus, Mr. Novitsky must establish anew that the officers violated his constitutional rights in this § 1983 action.

interests . . . [and] the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983).

In balancing these interests, the Supreme Court has held that "arrests, the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause." United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996) (internal quotation marks omitted). Investigative detentions, on the other hand, which are Fourth Amendment seizures of limited scope and duration, are reasonable if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity. Id. Similarly, officers may effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need "to assure the safety of the public and/or the individual." United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993).

The reasonableness of these latter two types of detentions – whether investigatory or non-investigatory – depends on whether the detention satisfies the two-part test set forth in Terry v. Ohio: (1) the detention must be "justified at its inception," and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20; King, 992 F.2d at 1560. Because Mr. Novitsky does not argue the officers' use of the twist lock placed him under arrest, Terry supplies the analytical framework for this case.

-14-

There is no question Mr. Novitsky was first seized for Fourth Amendment purposes when the officers roused him and ordered him from the vehicle. <u>Florida v. Bostick</u>, 501 U.S. 429, 439 (1991) (holding that a police-citizen encounter constitutes a seizure if "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter"). Because the officers encountered Mr. Novitsky lying in the fetal position in the back of a parked car in response to a "man down" call, we conclude these actions were a reasonable exercise of their community caretaking functions. <u>United States v. Garner</u>, 416 F.3d 1208, 1212-16 (10th Cir. 2005) (holding that an officer justifiably detained an individual whom he encountered responding to a report of a "man down, said to be unconscious in a half sitting, half slumped over position for several hours"). Thus, Mr. Novitsky's detention by the officers was "justified at its inception," and we turn to the question whether the officers' use of the twist lock was reasonably related in scope to the circumstances which justified the detention in the first place.

On this issue, we reach different conclusions as to each defendant officer. As to Officer Marshall, there is no evidence that he personally participated in the use of the twist lock. <u>See</u> <u>Trujillo v. Williams</u>, 465 F.3d 1210, 1227 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be

-15-

established."). Indeed, while he was present at the scene, the record makes clear that Officer Marshall did not assist or direct Officer Wortham in removing Mr. Novitsky from the vehicle. Thus, Mr. Novitsky has failed to allege that Officer Marshall violated his Fourth Amendment rights. Officer Marshall is therefore entitled to summary judgment on this claim.

On the other hand, Mr. Novitsky has sufficiently alleged that Officer Wortham had direct personal responsibility for the claimed Fourth Amendment violation because Officer Wortham personally applied the twist lock. Mr. Novitsky argues that this action was unreasonable because he did not pose a tenable threat to either officer's safety.

It is beyond dispute that the safety of law enforcement officers during the performance of their duties is a "legitimate and weighty" concern. Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977). Consequently, officers may use force during a Terry-type detention to the extent that "such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop." United States v. Hensley, 469 U.S. 221, 235 (1985).

Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993) (collecting cases). Officer safety is also the primary concern undergirding the right of an officer to perform a pat-down

-16-

search.  See United States v. Manjarrez, 348 F.3d 881, 886-87 (10th Cir. 2003)

("The purpose of the limited pat-down search is not to discover evidence of a

crime, but to allow the officer to pursue his investigation without fear of

violence.") (internal quotation marks omitted).  In evaluating whether the

precautionary steps taken by an officer were reasonable, "the standard is

objective – would the facts available to the officer at the moment of the seizure . .

. warrant a man of reasonable caution in the belief that the action taken was

appropriate."  Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31

(10th Cir. 1997) (internal quotation marks omitted).

In this case, Officer Wortham was certainly justified in having some

concern for his safety when he first encountered Mr. Novitsky in the backseat of

the vehicle.  See United States v. Holt, 264 F.3d 1215, 1222 (10th Cir. 2001) (en

banc) ("The Supreme Court has found it 'too plain for argument' that the

government's interest in officer safety is 'both legitimate and weighty,' given the

'inordinate risks confronting an officer as he approaches a person seated in an

automobile.'") (quoting Mimms, 434 U.S. at 110).  In addition, the circumstances

of the encounter – in particular the facts that Mr. Novitsky's companion was

intoxicated, that the vehicle smelled like alcohol, and that Mr. Novitsky was

curled up in the fetal position in the vehicle's backseat at two in the afternoon –

would lead a reasonable officer to believe that Mr. Novitsky might be intoxicated.

Because individuals who are intoxicated are often unpredictable, Officer

Wortham was confronted with an additional layer of uncertainty. See Bing v. City of Whitehall, 456 F.3d 555, 564 (6th Cir. 2006) (noting that reports regarding an individual who "appeared intoxicated, ma[de] it reasonable [for police officers] to expect he would act unstably").

The potential risks facing Officer Wortham during his encounter with Mr. Novitsky were, however, mitigated by several facts. As our previous panel recognized during Mr. Novitsky's criminal case, Officer Wortham testified that Mr. Novitsky did not make any furtive movements in the car. Moreover, Mr. Novitsky "did not resist Officer Wortham in any way; in fact, his demeanor was apparently benign, as he had begun to help himself out of the car when the twist [lock] was applied." Novitsky, 58 Fed. Appx. at 436. Furthermore, Officer Wortham testified there was no evidence that "a crime had occurred" or that Mr. Novitsky "had engaged in criminal activity." Id. Indeed, the officers did not encounter Mr. Novitsky while investigating a crime; they arrived in the YMCA parking lot to check on the welfare of Mr. Novitsky's companion.

Viewing these facts in the light most favorable to Mr. Novitsky, as we must, we think a reasonable jury could conclude (as a previous panel of this court did) that Officer Wortham's application of the twist lock for officer safety purposes was unreasonable under the Fourth Amendment. Cf. Gallegos, 114 F.3d at 1031 (holding that the use of an "arm bar maneuver" and "take-down" of an individual was reasonable to protect the safety of two officers in light of the

individual's "strange and aggressive conduct"). We therefore turn to the second prong of the qualified immunity analysis, asking whether Officer Wortham violated clearly established law.

2.    Prong Two: Clearly Established Law

In determining whether a right is clearly established, the "inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Saucier, 543 U.S. at 201. That is, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (internal quotation marks omitted).

Moreover, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Thus, where "officers of reasonable competence could disagree" regarding the lawfulness of specific conduct, qualified immunity is warranted. Id.

The plaintiff bears the burden of articulating clearly established law. Medina, 252 F.3d at 1128. To meet that burden, he or she may present precedent from the Supreme Court, the Tenth Circuit, or other circuits that is "on point." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001) (internal quotation marks omitted). For precedent to be "on point," it need not involve the unlawfulness of

-19-

the very action at issue. Rather, the unlawfulness of the action must be apparent in light of the pre-existing law such that "the state of the law [at the time of the incident] gave the [defendants] fair warning that their conduct was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Accordingly, the relevant question in this case is whether Officer Wortham had fair warning in June 2001 that using a twist lock to remove a potentially intoxicated individual from a vehicle for officer safety purposes was unreasonable under the Fourth Amendment. In his attempt to convince us to answer in the affirmative, Mr. Novitsky points to our decision in United States v. King, 990 F.2d 1552 (10th Cir. 1993).

In King, an officer approached a vehicle stopped near the scene of an accident to inform the driver to stop honking at the slow-moving traffic proceeding around the accident site. When the officer reached the vehicle, she saw a firearm tucked under the driver's right thigh. The officer then ordered the driver and his passenger out of the vehicle by pointing her firearm at the driver and "threatening to shoot . . . if he did not comply" with her order. Id. at 1562. Once the driver exited the vehicle, the officer placed him in handcuffs. Other officers subsequently recovered drugs from the passenger and a large amount of cash from the vehicle. The district court denied the driver's motion to suppress the drugs, gun, and cash as fruit of an unlawful seizure.

We reversed. In doing so, we first observed that the officer did *not* have

probable cause to arrest the driver upon seeing the gun because New Mexico law allowed individuals to carry firearms in their vehicles. Id. at 1563 n.5. We then concluded that, although the officer was entitled to "separate [the driver] from the gun for her own safety," the officer's threat to shoot the defendant and use of handcuffs "went far beyond what was necessary to ensure [the officer's] safety." Id. at 1563. Consequently, we held the seizure was unreasonable under the Fourth Amendment and suppressed the drugs, gun, and cash.

We do not think King would have given a reasonable officer "fair warning" that using a twist lock to remove Mr. Novitsky from the vehicle was unreasonable. As an initial matter, while King applies the rule that officers may only take steps that are reasonably necessary to protect their personal safety, this is insufficient in and of itself to clearly establish the unreasonableness of Officer Wortham's conduct. See Saucier, 533 U.S. at 201 (observing that the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition"). In addition, we fail to see how the facts of King – which involved an officer removing an individual from a vehicle at gunpoint after observing a firearm – would have given Officer Wortham fair warning that the risks presented by Mr. Novitsky were insufficient to justify the application of the twist lock.

Moreover, Mr. Novitsky has failed to direct our attention to any other cases that would have given Officer Wortham the requisite warning. Even so, we note

that some circuits have discussed at greater length the extent to which law enforcement officers may use forceful techniques to protect themselves from the risks presented by potentially intoxicated individuals. See, e.g., United States v. Brown, 232 F.3d 589, 595 (7th Cir. 2000) (holding that an officer's pat-down search of an intoxicated individual was reasonable under the circumstances of the case but stating that "one should not read into the opinion any implicit approval of the frisking of drivers during routine traffic stops for drunk driving"); United States v. Jaramillo, 25 F.3d 1146, 1151 (2d. Cir. 1994) (stating that circumstances which justify an officer in conducting a "pat-down of an individual include instances where that individual has engaged in suspicious behavior, for example, by appearing to . . . be driving while intoxicated"). Nevertheless, the risks presented by potentially intoxicated individuals are inherently fact-dependent and the extent to which an officer may use force in such situations has not been definitively answered by this circuit.

Furthermore, while we think a reasonable jury could conclude Officer Wortham unreasonably applied the twist lock, we reached that conclusion with the luxury of both hindsight and the time to reflect upon the relevant Fourth Amendment principles, neither of which was available to Officer Wortham. Because "officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation," Graham v. Connor , 490 U.S.

-22-

386, 396-97 (1989), and, as discussed above, a potentially intoxicated individual inside of a vehicle presents a significant risk to officer safety, we believe "officers of reasonable competence could disagree" regarding the lawfulness of using the twist lock on Mr. Novitsky. Malley, 475 U.S. at 341. See Gallegos, 114 F.3d at 1030 (concluding an officer "grabb[ing] [an individual's] arm three separate times" during a Terry-type detention comported with the Fourth Amendment because, in part, the officer's "actions consisted of a relatively minor application of force").

Accordingly, we conclude Mr. Novitsky has failed to establish that Officer Wortham violated clearly established law in using the twist lock to remove him from the vehicle. Officer Wortham is therefore entitled to qualified immunity.

B. FEDERAL PROSECUTION AND INCARCERATION

Next, Mr. Novitsky contends the district court erred in granting summary judgment to the officers on his claim that they violated his Fourth and Fourteenth Amendment rights by causing the federal prosecution and his resulting incarceration. In his appellate brief, Mr. Novitsky provides only a cursory discussion of the legal basis for this claim. He does, however, cite two cases as applicable precedent: Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir. 2004), and Robinson v. Maruffi, 895 F.2d 649, 655-56 (10th Cir. 1990). Based on this precedent, we view this claim as alleging malicious prosecution under § 1983 and address it as such. See Pierce, 359 F.3d at 1285-97 (discussing the elements of a

malicious prosecution claim under § 1983); Robinson, 895 F.2d at 651, 655 (discussing civil rights claim alleging "that the defendants knowingly permitted . . . false testimony to be used for the sole purpose of having [the plaintiff] prosecuted, convicted, and punished for . . . murder" and observing that "the essence of the claim was conspiracy for malicious prosecution"); see also Heck v. Humphrey, 512 U.S. 477, 484 (1994) (analyzing § 1983 plaintiff's claim for damages based on wrongful arrest and imprisonment under the common law elements of malicious prosecution).

In this circuit, when addressing § 1983 malicious prosecution claims, we use the common law elements of malicious prosecution as the "starting point" of our analysis; however, the ultimate question is whether plaintiff has proven the deprivation of a constitutional right. Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996). We look to both the Fourth and Fourteenth Amendments. See Pierce, 359 F.3d at 1285-86 ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.") (citations and footnote omitted).

The elements of the common law tort of malicious prosecution, as applicable in a § 1983 claim, are: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest,

continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.  Pierce, 359 F.3d at 1291-1297.  Below, the district court determined that Mr. Novitsky failed to introduce sufficient evidence of the first element, that is, that the officers caused his federal prosecution and incarceration.

Mr. Novitsky strenuously challenges this conclusion on appeal.  First, he argues that, viewed in the light most favorable to him, the officers caused him to be indicted and bound over for trial by inaccurately recounting the sequence of events leading to the discovery of the firearm in the Serialized Property Report.  Second, he argues that, viewed in the light most favorable to him, the false statement in the report and both officers' affirmation of the report's accuracy when meeting with Agent Porter resulted in the district court denying his initial motion to suppress the firearm and, thus, his incarceration until we affirmed the district court's grant of his second motion to suppress.  See id. at 1292 ("This Court has previously held that officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions.").

Even assuming these arguments are correct, Mr. Novitsky cannot, in any event, establish the third (lack of probable cause) element of a common law malicious prosecution claim.  Indeed, there is no question that probable cause

-25-

supported Mr. Novitsky's prosecution and continued incarceration during his trial on the felon in possession of a firearm charge because Mr. Novitsky admitted he was a felon and possessed a handgun in the affidavit he furnished to the BATF. Cf. id, 359 F.3d at 1295 (concluding that "falsification of inculpatory evidence or suppressing of exculpatory evidence" that "was necessary to the finding of probable cause" would establish the lack of probable cause element).

Similarly, Mr. Novitsky has failed to introduce sufficient evidence that the misstatement in the report and the officers' failure to recognize that mistake were intentional, "rather than out of negligence or inadvertence." Taylor, 82 F.3d at 1563. This is particularly true given Officer Wortham's candid testimony during Mr. Novitsky's criminal trial and the second motion to suppress hearing. Thus, Mr. Novitsky has failed to set forth sufficient evidence of the fourth (malice) element of a malicious prosecution claim.[3] Cf. Robinson, 895 F.2d at 655 (holding sufficient evidence of malice where "the defendants purposely concealed and misrepresented material facts" by manufacturing testimony for the "state's key witnesses").

_____

[3] Whether the filing of a false police report, as alleged by Mr. Novitsky, might support a cause of action other than malicious prosecution, is a question not before us. See Gauger v. Hendle, 349 F.3d 354, 359 (7th Cir. 2003) (observing that "[w]hen a defendant is arrested and jailed on the basis of probable cause to believe that he has committed a crime and only later does police fraud enter the picture with the effect of perpetuating the seizure without good cause, there is a question not as yet authoritatively resolved whether the Fourth Amendment has been violated").

Accordingly, the officers are entitled to summary judgment on Mr. Novitsky's malicious prosecution claim.

## C. CITY'S LIABILITY

A municipality cannot be held liable for its officers' actions under § 1983 unless those actions were caused by a policy or custom of the municipality. Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978). In his final challenge to the district court's grant of summary judgment against him, Mr. Novitsky argues there is sufficient evidence for a reasonable jury to conclude that the City had a policy under which its officers applied the twist lock and conducted pat-down searches at any Terry-type stop notwithstanding the absence of criminal activity or a threat to officer safety.[4]

A municipal policy is a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers." Id. An act committed by an official who has been delegated the power of "establishing final policy" will also constitute a municipal policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). In addition, "where a

_____

[4] As he did in his first claim against the officers, Mr. Novitsky challenges the district court's denial of his motion for partial summary judgment. He once more invokes the doctrine of collateral estoppel and argues that "re-litigation of the determination by the District Court and Court of Appeals [in his criminal of case] that the search was . . . conducted pursuant to [a City] policy is precluded." Aplt's Br. at 10. This argument is (again) misplaced. The issue whether Mr. Novitsky was seized pursuant to an unconstitutional City policy was not an issue decided during Mr. Novitsky's criminal case.

municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants," that failure to train may "be properly thought of as a city policy . . . [and] is actionable under § 1983." City of Canton v. Harris, 489 U.S. 378, 389 (1989) (internal quotation marks omitted).

Mr. Novitsky argues that sufficient evidence existed for a reasonable jury to conclude the City maintained an unconstitutional policy based on two pieces of evidence: (1) Officer Wortham's testimony during Mr. Novitsky's criminal prosecution, and (2) the affidavit of the City's expert witness, Officer Steve Norton.[5] Mr. Novitsky emphasizes that Officer Wortham testified that using the

---

[5] In pertinent part, Agent Norton's affidavit provides:

While the Aurora Police Department instructs its officer to <u>not</u> put their hands on people unless they have a legal justification to do so, the Department also teaches its officers that it is far safer to remove a person from a vehicle in order that they can be watched and covered, pursuant officer safety procedures. If an officer continues contact with occupants in a vehicle, there is a risk to their safety associated with the limited visibility as to the occupants' movements or the occupants' accessibility to weapons. This practice of removing occupants from a vehicle is in accordance with *Pennsylvania v. Minns* [sic] (1977), which outlines accepted officer safety practices for purposes of the Fourth Amendment. . . .

The Aurora Police Department trains its officers that their actions in such situations are source-scenario driven or circumstantially-driven, i.e., they can properly apply officer safety tactics and procedures based upon the situation they are dealing with and what they observe.

(continued...)

twist lock was "[j]ust *standard procedure . . .* when taking somebody out of a vehicle that's been sleeping or possibly alcohol related." Aplt's App. at 251 (emphasis added). In addition, he argues that Agent Norton's affidavit contains "contradictory pronouncements" that "can be read to say that the [City] is advising its officers that, while it is a violation of the Fourth Amendment to place their hands on people, it is [the City's] policy to allow officers to disregard the Fourth Amendment and apply the [twist lock]." Aplt's Br. at 36-37.

No reasonable jury could infer the existence of an unconstitutional policy based on this evidence. First, Mr. Novitsky misinterprets Officer Wortham's testimony by overlooking the context in which Officer Wortham testified as well as his later testimony explaining that he would only use the twist lock when he had legal justification to do so. Reading Officer Wortham's testimony in context, it is clear that, during the criminal trial, Officer Wortham assumed he had sufficient grounds to apply the twist lock because Mr. Novitsky's companion was intoxicated and the car smelled like alcohol. Thus, at most, his testimony indicates that the twist lock was a "standard procedure" to be employed by the City's officers when, and only when, they had legal justification.

Similarly, Mr. Novitsky misreads Officer Norton's affidavit, which simply provides that the City gives its officers discretion to determine if they could

[5](...continued)
Aplt's App. at 152-54.

-29-

lawfully use the twist lock to protect their safety. As the Supreme Court has emphasized, "discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembaur, 475 U.S. at 482. Here, Mr. Novitsky has not given us any "more." He baldly asserts Officers Wortham and Marshall constituted official policymakers, but fails to introduce any evidence that such authority was delegated to them. Likewise, he has failed to show that any need for the City to train its officers regarding when they may lawfully apply the twist lock was so "plainly obvious" that the City's failure to do so constituted "deliberate indifference." Harris, 489 U.S. at 390 n.10.

Accordingly, the district court properly entered summary judgment in favor of the City.

## IV. CONCLUSION

For the foregoing reasons, the district court's entry of summary judgment was proper and is hereby AFFIRMED.