FILED
United States Court of Appeals
Tenth Circuit

April 16, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LEVI McRAE LUGINBYHL, JR.,

    Defendant - Appellant.

No. 07-5178
D.C. No. 06-CR-206-CVE
Northern District of Oklahoma

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ, HOLLOWAY** and **O'BRIEN**, Circuit Judges.

---

Defendant-appellant Levi Luginbyhl was convicted at jury trial of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and possession of an unregistered shotgun without a serial number and with a barrel less than 18 inches long, in violation of 26 U.S.C. §§ 5841, 5845(a)(1), 5861(d), & 5871. He was sentenced to 95 months' imprisonment on both Counts I and II to run concurrently, 3 years' supervised release, standard and special conditions of supervision, a $1,000 fine and a $200 special assessment. On a timely appeal, he challenges the denial

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P.32.1 and 10th Cir. R. 32.1.

of his motion to suppress the firearm on the theory that the discovery of the weapon was the fruit of an unlawful arrest or detention. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

Early on a mid-November afternoon in 2006, a "complaint-taker" for the Tulsa police received a call from the home of Yvette Hill. The caller was Ms. Hill's daughter. The caller said that there was a man in the backyard of a neighbor's house who was "stealing stuff in the back of his house." The complaint-taker asked for a description of the man, and then asked whether he was white, black, Indian or Hispanic. The caller said the man looked like a Mexican and was "going crazy." The caller then gave the phone to her mother, Ms. Hill.

Hill said the man looked like he was "on drugs or something" because he was "doing some weird stuff." She later described his actions as "some crazy karate stuff." As Ms. Hill remained on the line with the complaint-taker, she said that her neighbor had returned and was "confronting" the man. The complaint-taker then heard Ms. Hill tell someone to "go and get the gun and shoot this man," and warned Ms. Hill not to use a gun because it would "make it worse."

The complaint-taker asked if the man was assaulting the neighbor, and Hill responded, "right now he's just talking to him." Hill stated, "This man looks like he is crazy or something because he is doing his hands all crazy ways and . . . see he was out

-2-

here doing martial arts. I guess he's on drugs or something." Hill told the complaint-taker that she thought the neighbor "told him to get out of his yard so he's leavin'." She repeated that he was "going toward the sidewalk . . . . The owner made him leave. So he's fine, I mean, I guess."

While Ms. Hill was still on the line, the complaint-taker relayed the information to a police dispatcher who, within two minutes after the phone call began, notified Tulsa Police Officer Steve Williams about a "suspicious subject" at the Hill's address. The dispatcher described the suspect as a Hispanic male in his thirties, wearing all black, and told Williams that the caller believed the man to be "possibly on drugs in the neighbor's yard and the person who lives there is now confronting the Hispanic male."

A different dispatcher then told Williams: "The elderly neighbor said something about getting a gun. It looks like somebody . . . our caller told the neighbor not to get a gun. It now looks like the subject may be walking away." Officer Williams apparently misunderstood this message, however, because he later testified that "the way I interpreted the dispatch to me was that there was a gun, or someone may have a gun, or somebody was going to go get a gun. And the dispatcher wasn't sure whether – excuse me – whether it was the complainant or whether it was the individual that was in the backyard that was referencing the gun." In his report, Officer Williams said that, on arriving at the scene he had been "advised that the subject stated he was going to get a gun and was last seen walking northeast towards E. 16th."

Officers Williams and Don Arent both responded to the dispatch, driving separate

cars. They arrived at the Hill residence almost simultaneously. Officer Arent went straight to the house, and because the subject had last been seen leaving northbound, Officer Williams went around the block and drove west on East 16th Street. He saw a subject matching the description coming from between two houses at about 8500 East 16th Street.

Officer Williams stopped his patrol car and asked the man, later identified as Luginbyhl, to approach. When he did, Officer Williams asked him for a form of identification, and Luginbyhl verbally identified himself. Before or just after identifying himself, Luginbyhl said that he did not recognize the officer's authority, Williams testified, "due to the fact that he had signed some kind of paper or something." This unusual assertion caused Officer Williams to wonder if Luginbyhl might be intoxicated or have mental problems. He also began to consider the possibility that he might be dealing with some type of anti-government individual, who was likely to be carrying some type of weapon. Officer Williams was also concerned that Luginbyhl was a burglar, and might be carrying some kind of tool such as screwdriver or pry bar that could be turned into a weapon and used against him.

For safety, Officer Williams waited until Officer Arent arrived to pat Luginbyhl down, about five to ten minutes from the initial contact. Officer Williams directed Luginbyhl to place his hands behind his head and interlock his fingers, and Luginbyhl initially complied. When Officer Williams grabbed his hands to do the patdown, he felt Luginbyhl hesitate to comply. Through Luginbyhl's heavy coat, Officer Williams felt a

-4-

tool or weapon on his left side. He lifted the coat and saw the butt of what appeared to be a firearm stuck between Luginbyhl's pants and shirt. Officer Williams then swept Luginbyhl's feet out from underneath him and took him to the ground. He notified Officer Arent that Luginbyhl had a gun, and Williams then recovered the gun and placed handcuffs on Luginbyhl.

The gun recovered from Luginbyhl was a loaded, 16-gauge, sawed-off shotgun. The officers also recovered a roll of duct tape, a stocking cap, and a pair of handcuffs from Luginbyhl's person.

Defendant testified both at the suppression hearing and at trial. He said that he went into the backyard to look at a trailer he had noticed there before, which looked like a trailer used to sell concessions at carnivals and fairs. He said that he had sold concessions at carnivals in the past and thought that he might get a job with the owner of the trailer. When defendant got there he noticed a lot of rocks with crystals. When the owner approached him, defendant said, defendant asked him about a job and whether he could have some of the crystals. Defendant admitted that he had practiced some martial arts moves before the homeowner arrived, saying that it was cold and he did that to warm himself.

**II**

The district court found the detention of defendant reasonable under two alternative theories. Although she said the parties had focused on whether the detention was justified under *Terry v. Ohio*, 392 U.S. 1 (1968), the judge first reasoned that the

-5-

detention was valid under the theory of law enforcement's community caretaker function. Law enforcement officers "are not only permitted, but expected, to exercise what the Supreme Court has termed 'community care taking functions, totally divorced from the detection, investigation, or acquisition of evidence" relating to a crime. *United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993). A brief, non-investigatory detention is permissible when articulable facts indicate the need to assure the safety of the public or the individual being detained.

This detention was reasonable under the care taking function, the judge reasoned, citing these facts: defendant had walked into the backyard of a private residence; his conduct had alarmed the neighbors; the neighbors had reported that he might be on drugs; and the officer had a mistaken, but good faith, belief that defendant might have been going to get a gun (as explained below). Because defendant appeared to be either on drugs or in a "psychotic episode," Officer Williams could stop him to check on his condition and determine whether he posed a threat to himself or others. "At a minimum," the judge said, the officer was aware that neighbors were concerned by defendant's "bizarre behavior," and so the officer was obligated, not just permitted, to investigate the situation to ensure the safety of the community. And for the same reasons, the protective frisk of defendant was justified.

The judge's reference to the officer's mistaken belief that the defendant might be going to get a gun should be explained. As shown in the summary of the background facts, the original phone call from the residence of the neighbors, Ms. Hill and her

daughter, went to a "complaint-taker," who relayed the information to a dispatcher (actually in this case two different dispatchers were involved), who communicated with the officers in the field. In this process some of the information got distorted. The start of the chain was Ms. Hill's remark to someone on her end of the line, perhaps her daughter, to "go get the gun to shoot this man," which the complaint-taker heard and to which she responded by cautioning Hill not to escalate the situation. Hill's subsequent remarks reported that the suspect and the neighbor were only talking and then that the suspect was leaving.

As these reports were forwarded to the dispatcher and then to Officer Williams, the second dispatcher told the officer that "the elderly neighbor said something about getting a gun." Officer Williams testified, however, that he understood the communication to be that "the subject said he was going to get a gun." As noted, the district judge found the officer's mistaken interpretation of the communication was in good faith.

After concluding that the detention and frisk were justified under the community caretaker function, the district judge continued by also analyzing the detention as an investigatory stop under *Terry v. Ohio*. Officer Williams had a reasonable suspicion of criminal activity, the judge found, based on these facts: (1) a caller had reported a "suspicious subject"; (2) defendant had entered someone's private property; (3) defendant was "possibly on drugs"; (4) the owner of the home was confronting defendant; (5) "the elderly neighbor said something about getting a gun." (Quote marks are in the district court's order; the judge was quoting from the evidence produced at the suppression

hearing.) Also, dispatch had been told that the defendant was "acting crazy." On these facts, the officer had reason to suspect, at a minimum, that defendant was intoxicated in public, the judge concluded. Reasonable suspicion of a misdemeanor is sufficient under *Terry*. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997). Although when the officer spotted defendant he was not stumbling or otherwise exhibiting signs of drunkenness, he could have been under the influence of drugs.

Also, Officer Williams testified that he suspected that defendant may have been involved in attempted burglary. He testified that in his experience burglars will often abandon their attempts and move on if a homeowner returns unexpectedly. He also testified that burglars are often drug users looking for money to buy drugs, in his experience, and the neighbor's report said that defendant might be on drugs. The fact that Williams had been advised that defendant was leaving the premises did not alter the analysis. The belief that defendant was engaged in criminal activity was reasonable.

The district judge also rejected defendant's argument that the detention lasted for an unreasonable amount of time. Officer Williams testified that he asked defendant for his name and identification. The defendant told the officer his name but did not provide identification. Defendant also said that he didn't recognize the officer's authority and told the officer about his anti-government beliefs. Officer Williams waited five to ten minutes for backup to arrive before he frisked defendant. The court found that the length of detention was not excessive and that defendant himself had prolonged the encounter by refusing to provide identification and by espousing his novel theories.

### III

In reviewing the denial of a motion to suppress evidence, we accept the findings of fact made by the district court unless they are clearly erroneous, but the ultimate question of reasonableness under the Fourth Amendment presents a question of law for our plenary review. *See, e.g., United States v. Manjarrez*, 348 F.3d 881, 884 (10th Cir. 2003). We conclude that the district court was correct in its analysis and holding that the investigatory stop of Mr. Luginbyhl was justified by reasonable suspicion that he was engaged in criminal activity.

"Investigative detentions, . . . which are Fourth Amendment seizures of limited scope and duration, are reasonable if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007). An investigatory detention must be "justified in its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

In support of its conclusion that the investigatory stop of defendant was justified at its inception, the district court pointed to these facts: (1) a caller had reported a suspicious subject; (2) defendant had entered someone's private property; (3) defendant was possibly on drugs; (4) the owner of the home was confronting defendant; (5) the elderly neighbor said something about getting a gun. A few additional observations and inferences may also be noted. First, and very significantly in our view, the defendant's unusual behavior, beginning with his intrusion into a backyard of a home, had not merely

drawn the attention and suspicion of the neighbors but had positively alarmed them. Also, as the district court pointed out, Officer Williams thought that dispatch had reported that the subject was going to get a gun. The judge specifically found that this mistake was a reasonable one, given the limitations of communication from the neighbor, through the complaint-taker to dispatch, and ultimately to the officers over the radio.

Then there are the inferences that a reasonable officer could make from this information, and which Officer Williams did make. One is that the subject may have been intoxicated on drugs or alcohol. Another is that the subject may have been a burglar "casing" the houses in the neighborhood. We note also that these two inferences are hardly mutually exclusive. As Officer Williams testified, in his experience many burglaries are committed by drug-users who are trying to fund the purchase of more drugs.[1]

It is well settled that the information received by the dispatcher may be reasonably relied upon by the field officer for the purpose of establishing probable cause to arrest or reasonable suspicion for an investigative stop. *See United States v. Hensley*, 469 U.S. 221, 229-33 (1985). Under the "fellow officer" rule, "law enforcement officers may pool their information[,] and . . . reasonable suspicion is to be determined on the basis of the

[1]Our discussion assumes that Officer Williams detained defendant at the beginning of their encounter when, according to the officer's testimony, he called out to defendant and asked him to approach. We make the assumption because the government seems implicitly to take this position. No contentions are made in this appeal, for example, as to whether the officer's tone of voice suggested a request rather than a command for Luginbyhl to approach him. We thus have no occasion to decide if the encounter began as a strictly consensual one.

-10-

collective knowledge of all the officers involved." *United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997). Luginbyhl argues that exculpatory information received by dispatch must also be taken into account. He points specifically to the caller's remarks to the complaint-taker that nobody had a gun, that the feared confrontation between the subject and her neighbor appeared to have ended amicably, and that the subject was walking away toward the street.

This argument is unavailing for Luginbyhl because this information would merely have suggested, to the reasonable officer, that the chances of an immediate, possibly violent confrontation involving the homeowner had apparently been reduced. But the remaining facts were still sufficient to support the investigative stop. The denouement of the original encounter did nothing to explain Luginbyhl's behavior and did not eliminate the prospect that he was either intoxicated in public, or casing the neighborhood in view of a possible burglary, or both. Officer Williams testified that it would not be unusual, in his experience, for a prospective burglar to peacefully retreat and pick another target upon being discovered by a homeowner. And Officer Williams testified that burglars are often armed or carrying tools that could be used as weapons. Thus, the peaceful conclusion of the meeting between defendant and the homeowner did not dispel the suspicion that defendant might be armed, even if we were to attribute to Williams the last information given by the original complainant, information that was not actually transmitted to Williams. It is well settled that an officer with reasonable suspicion for an investigative detention need not have ruled out all possible innocent explanations for the observed

conduct. *See United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

Moreover, we are mindful that this argument by Luginbyhl is, in effect, an attempt to nullify Officer Williams' testimony that he had interpreted dispatch's report to say that the subject was going to get a gun and the district court's specific finding that this mistake was a reasonable one under the circumstances. "'A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.'" *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) (quoting *United States v. Ornelas-Ledesma,* 16 F.3d 714, 718 (7th Cir. 1994), *vacated on other grds.*, 517 U.S. 690 (1996)). In sum, we find that the detention was justified by reasonable suspicion.

Luginbyhl also challenges the length of his detention and the circumstances of the frisk to which he was subjected. Indeed, he contends that the encounter was so intrusive as to constitute an arrest as a matter of law, and he argues that there was no probable cause to justify an arrest. We are not persuaded that the encounter should be treated as an arrest.

As for the length of the detention, the district judge found that Luginbyhl himself was responsible for its prolongation, because he used the occasion to share with Officer Williams some of his unusual views about governmental authority, particularly as it pertained to him. However, Officer Williams did not testify that the encounter was

prolonged for this reason.[2]  Instead, he testified that he believed it necessary for his

protection and for the safety of those nearby to determine if Mr. Luginbyhl was armed.

Not only had Officer Williams mistakenly believed that dispatch had reported that

Luginbyhl had said something about getting a gun, but the officer's suspicion that

Luginbyhl had been intent on burglary raised a likelihood that he would be armed.

Consequently, Williams testified, he prolonged the encounter waiting for backup to arrive

so that he would not have to perform the protective frisk alone.  Considering that the

prolongation of the stop for this purpose was relatively brief, we find this reasonable.  *See*

*United States v. Walraven*, 892 F.2d 972, 976 (10th Cir. 1989).

We find that the force used in connection with the frisk was reasonable.

Luginbyhl's argument on this point is primarily based on the contention that the

"locking" of his interlaced fingers during the frisk was excessive force, which he says is

like the "twist lock" maneuver that we found excessive under the circumstances in

*Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007).  First, we note that we are at a

substantial disadvantage in considering this argument because the record does not make it

clear just what the "locking" of Luginbyhl's fingers entailed.  We are not willing to

---

[2]Officer Williams did testify that the unusual ideas expressed by Luginbyhl increased his apprehension that Luginbyhl might present a threat.  Because the officer had already detained Luginbyhl by this time and because the factors justifying the initial detention also justified, in our view, the length of the encounter and the decision to frisk Luginbyhl, we have not relied on this factor in our analysis.  This does not mean, however, that we do not accept the officer's testimony on this point. Nor do we mean to discount the possibility that similar facts might be of greater significance under other circumstances.

merely assume, as Mr. Luginbyhl apparently would have us do, that this technique involved infliction of pain, as was described in *Novitsky*. We find no evidence in this record that the tactic used by Officer Williams caused pain.

Moreover, the two cases are simply not analogous. In *Novitsky*, the encounter was with a person that the officer had no reason to suspect was either involved in a criminal act or dangerous. We have already made it clear that in this case the officer reasonably perceived that Luginbyhl might be both involved in criminal activity and potentially armed. Moreover, while the record does not make it clear just what the challenged tactic was, the record does make it clear that the technique was used only during the very brief time required to conduct a patdown of Luginbyhl's outer clothing.

It is well established that the use of some force does not per se transform an investigative detention into an arrest. Officers are "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Under appropriate circumstances, restraints more intrusive than were used here may be valid in a *Terry* stop. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030-31 (10th Cir. 1987).

**IV**

Counsel for defendant raises other issues at defendant's request and with a statement under *Anders v. California*, 386 U.S. 738 (1967), that counsel finds them without merit. We agree with counsel's assessment that these contentions are, to the

-14-

extent that they are comprehensible, totally frivolous.

Therefore, the judgment of the district court is AFFIRMED. Judge Hartz concurs in the result and joins in the entire opinion except insofar as it relies on the officer's misunderstanding of the communication from the dispatcher.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge

-15-