FILED
United States Court of Appeals
Tenth Circuit

July 24, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAMUEL TERRAYE WINDOM,

Defendant - Appellant.

No. 16-1027

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CR-00202-RM-1)**

---

Jacob Rasch-Chabot, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, and Dean Sanderford, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Bryan D. Fields, Assistant United States Attorney (Robert C. Troyer, Acting United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

---

Before **HARTZ**, **BALDOCK**, and **HOLMES** Circuit Judges.

---

**HOLMES**, Circuit Judge.

Defendant-Appellant Samuel Terraye Windom entered a conditional guilty plea to

one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

Mr. Windom now appeals from the district court's denial of his motion to suppress the firearm, arguing that officers obtained the firearm as part of an unconstitutional seizure. More specifically, Mr. Windom takes the position that officers used unreasonable "high-risk" traffic stop procedures to investigate a "completed misdemeanor"—that is, Mr. Windom's flashing of a firearm in public—and submits that the unreasonable nature of the force involved in the stop elevated it from an investigative detention to an arrest without probable cause. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the district court's order denying Mr. Windom's suppression motion.

**I**

Mr. Windom was detained and arrested on April 1, 2015, following an incident at Challengers Sports Bar and Restaurant ("Challengers") in Aurora, Colorado. Just before midnight on that evening, a female Challengers employee contacted the Aurora Police Department ("APD") to report that an unknown male, later identified as Mr. Windom, had flashed a gun to bar patrons and claimed to be a Crips gang member. The employee indicated, however, that the individual—whom she further described as a thirty-three year-old black male, 6'2" or 6'3" tall, with braided hair, wearing jeans and a black jacket with a cobra on the back—had not threatened or injured any patron. By the time the employee called APD, Mr. Windom had left Challengers but remained in the parking lot immediately outside. As the call progressed, the employee observed him getting into one of two vehicles—either a Nissan Murano ("Murano") or an older model, light blue Cadillac sedan ("Cadillac") that was immediately next to the Murano—and stated that he

2

appeared to have headed westbound out of the parking lot.

APD's dispatch relayed the "weapons call" to several local officers, advised them of the nature of the alleged conduct, and provided Mr. Windom's physical description. Aplt.'s Ex. A-1, at 3. The APD officers that first arrived on the scene, however, found the Murano in the parking lot, without an individual matching Mr. Windom's description, and the en-route officers therefore turned their attention to the other vehicle described by the caller (i.e., the Cadillac).

APD Officer Jeremy McElroy was approaching Challengers in his patrol vehicle when he observed a Cadillac matching the description from the call traveling in the opposite direction approximately two miles from Challengers. Officer McElroy made a u-turn and proceeded to follow the vehicle, and after backup arrived, he initiated "a high-risk traffic stop," R., Vol. III, at 79, based on his belief that the vehicle contained "a gang member" "armed with a gun," R., Suppl. Vol. I, at 19 (Tr. Mot. Hr'g, dated Sept. 4, 2015). More specifically, Officer McElroy drew his weapon and pointed it at the pulled-over Cadillac, wedged himself behind his door jamb for protection, and activated "spotlighting . . . to light the vehicle." R., Vol. III, at 79–80. Meanwhile, at least two more APD officers provided "lethal cover," that is, "they [too] had their guns drawn and pointed at the Cadillac, as well as its occupants." *Id.* at 80. After the officers assumed their covered positions, Officer McElroy "yell[ed]" for the occupants to "get [their] hands up[ and] turn the car off," and directed "them [to] throw the keys out [of] the driver's side window." R., Suppl. Vol. I, at 20.

3

Officer McElroy then ordered all of the occupants to exit the vehicle and assume the prone position—i.e., to lie face-down on the ground with legs crossed. The driver emerged first, and while her initial response was "somewhat argumentative," she complied with the officer's instructions and assumed the prone position. *Id.* Mr. Windom then emerged from the front passenger door, and Office McElroy immediately noticed that he matched the description that the Challengers employee had provided: e.g., a black man, about 6'2" tall, with braided hair wearing a black jacket and blue jeans. Mr. Windom assumed the prone position without objection. Finally, a third occupant—a pregnant female—exited from one of the rear passenger doors and was ordered to get "down on her knees" outside of the vehicle. *Id.* at 22.

Some of the officers checked the Cadillac to ensure that it had no other occupants and then proceeded to handcuff and pat down each individual, while other officers kept watch, providing "lethal cover." *Id.* At that point, the officers positively identified the male occupant as Mr. Windom, found a Smith & Wesson revolver in his pocket during the course of a pat-down, and arrested him for the crime of disorderly conduct based on his actions at Challengers.

On May 5, 2015, a federal grand jury in Colorado indicted Mr. Windom on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Shortly after the Indictment, Mr. Windom moved to suppress the firearm as fruit of an illegal seizure, arguing that "the conduct of the law enforcement officers following the traffic stop constituted an arrest of the occupants of the vehicle, including Mr. Windom,

4

from the moment the officers drew their weapons and ordered the occupants to exit the vehicle." R., Vol. I, at 59 (Mot. to Suppress Evid., filed July 6, 2015). Mr. Windom argued that the officers' use of "high-risk" stop techniques was unreasonable under the circumstances, thereby converting the purported investigative detention into an arrest without probable cause in violation of the Fourth Amendment.

Following a hearing, the district court denied the suppression motion, concluding that the officers had "reasonable and articulable suspicion" that, within the Cadillac, they would encounter an "armed and dangerous" individual, R., Vol. III, at 86, "who identified himself as a gang member, [had] show[n] a gun to patrons at a restaurant and bar and [had] caus[ed] enough concern for a private citizen to call and report the matter to police," *id.* at 91. In other words, although the district court recognized that "the use of force [could] elevate [an investigative] encounter to an arrest," it found the officers' "display of firearms" in this instance "permissible without probable cause," because the officers "reasonably believe[d]" that they needed firearms to protect themselves from a potentially dangerous situation. *Id.* at 92.

In the aftermath of the district court's suppression decision, Mr. Windom entered a conditional guilty plea, in which he reserved the right to appeal from that decision. Following his plea, the district court sentenced Mr. Windom to forty-six months' imprisonment, and he brought this timely appeal.

**II**

Mr. Windom contends that the district court erred in denying his suppression

5

motion, arguing that officers discovered the firearm during the course of an unreasonable seizure in violation of the Fourth Amendment. Mr. Windom acknowledges that the officers had reasonable suspicion to stop the vehicle, but he takes the position that the officers' use of force exceeded the bounds of an investigative stop, thus converting the stop into an arrest without probable cause. Therefore, he argues, the seizure was unlawful and the firearm that the officers subsequently discovered should be suppressed. The government argues that based on the totality of the circumstances known to the officers at the time of the stop—notably, their reasonable suspicion that an allegedly armed suspect who claimed to be a gang member was in the vehicle—they were justified in taking heightened precautionary measures during the stop.

## A

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Mosley*, 743 F.3d 1317, 1322 (10th Cir. 2014) (quoting *United States v. Apperson*, 441 F.3d 1162, 1184 (10th Cir. 2006)); *accord United States v. Madrid*, 713 F.3d 1251, 1255 (10th Cir. 2013). The only issue in this appeal is whether the force used by the officers in seizing Mr. Windom was reasonable in the context of an investigative detention; if not, under the circumstances present here—where the officers undisputedly lacked probable cause at the time they implemented the high-risk measures—the seizure would be unlawful because it would be

6

an arrest without probable cause.

**B**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A temporary investigative detention, such as a traffic stop, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Madrid*, 713 F.3d at 1255 (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)); *see also United States v. Hensley*, 469 U.S. 221, 226 (1985) ("[S]topping a car and detaining its occupants [for investigative purposes] constitute[s] a seizure within the meaning of the Fourth Amendment."). Generally, a seizure must be based on probable cause. *See, e.g.*, *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012) ("Probable cause is generally required before an officer may conduct a search or a seizure."); *United States v. Harris*, 313 F.3d 1228, 1233–34 (10th Cir. 2002) (noting "the general rule that seizures and searches be supported by probable cause").

In *Terry v. Ohio*, 392 U.S. 1 (1968), however, the Supreme Court recognized "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security [i.e., to effect a seizure] based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698 (1981). "The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of . . . competing interests to determine the reasonableness of the type of seizure involved within the meaning of 'the Fourth Amendment's general

7

proscription against unreasonable searches and seizures.'" *United States v. Place*, 462

U.S. 696, 703 (1983) (quoting *Terry*, 392 U.S. at 20). "The touchstone of our analysis

under the Fourth Amendment is always 'the reasonableness in all the circumstances of the

particular governmental invasion of a citizen's personal security.'" *Pennsylvania v.*

*Mimms*, 434 U.S. 106, 108–09 (1977) (quoting *Terry*, 392 U.S. at 19).

To determine the reasonableness of a particular seizure, and thus its

constitutionality, "[w]e must balance the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the importance of the governmental

interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)

(alteration in original) (quoting *Place*, 462 U.S. at 703); *see also Summers*, 452 U.S. at

700 n.12 (describing "reasonableness—the balancing of competing interests"—as "the

key principle of the Fourth Amendment" (quoting *Dunaway v. New York*, 442 U.S. 200,

219 (1979) (White, J., concurring))); *United States v. Moran*, 503 F.3d 1135, 1141 (10th

Cir. 2007) ("We determine the constitutionality of an investigatory stop by balancing 'the

nature and quality of the intrusion on personal security against the importance of the

governmental interests alleged to justify the intrusion.'" (quoting *Hensley*, 469 U.S. at

228)); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) ("Reasonableness is

determined by balancing the governmental interest in crime prevention against the

citizen's right to be free from governmental intrusion.").

When evaluating the reasonableness of a traffic stop under *Terry*, we engage in a

two-part inquiry—asking, first, whether the stop was "justified at its inception," and

8

second, whether "the officers' actions [were] 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Madrid*, 713 F.3d at 1256 (quoting *Terry*, 392 U.S. at 20). Under *Terry*'s first prong, an officer may "make a *forcible stop* of a person when the officer has reasonable, articulable suspicion that the person *has been*, is, or is about to be engaged in criminal activity." *Place*, 462 U.S. at 702 (second emphasis added); *see also Florida v. Royer*, 460 U.S. 491, 498 (1983) ("[C]ertain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime."); *Summers*, 452 U.S. at 698 n.7 (same); *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) ("An investigatory detention 'is justified at its inception "if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime."'" (quoting *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009))).

Here, Mr. Windom acknowledges that the officers had reasonable suspicion to stop the vehicle. But Mr. Windom challenges the manner in which they executed the stop, arguing that their seizure involved such a heightened degree of force that it converted an investigative stop into an arrest that needed to be (but was not) justified by probable cause.[1] Therefore, we focus on *Terry*'s second inquiry—whether the officers' conduct

---

[1]     The government urges us to find that Mr. Windom waived the argument he pursues on appeal, which relates to the nature and scope of the investigative stop—not the grounds for initiating the stop to begin with: "[Mr. Windom] conceded [before the district court] that the nature of the stop was reasonable given the suspected conduct, but

9

was "reasonably related in scope to the circumstances which justified the interference in the first place." *Madrid*, 713 F.3d at 1256 (quoting *Terry*, 392 U.S. at 20). And, in that regard, we center our inquiry on whether the officers' use of high-risk stop techniques was reasonable under the circumstances. *See Place*, 462 U.S. at 708 (examining "whether the [officers'] conduct . . . was such as to place the seizure within the general rule requiring probable cause for a seizure *or* within *Terry*'s exception to that rule" (emphasis added)); *see Mimms*, 434 U.S. at 108–09 ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" (quoting *Terry*, 392 U.S. at 19)); *United States v. Hood*, 774 F.3d 638, 643 (10th Cir. 2014) ("In resolving the second question, we consider whether 'the officers' actions were consistent with a *Terry* stop, or if the degree of force used transformed Defendant's seizure into a de facto arrest.'" (quoting *Mosley*, 743 F.3d at 1328)), *abrogated on other grounds by Mathis v. United States*, --- U.S. ----, 136 S. Ct. 2243 (2016) (requiring courts to distinguish

---

argued that the stop was not justified at its inception." Aplee.'s Br. at 8. According to the government, after losing on his challenge to the stop at its inception, Mr. Windom "has now inverted his position" on appeal, conceding the lawfulness of the stop at its inception and challenging its nature and scope. *Id.* at 9. If Mr. Windom were in fact advancing a different suppression theory on appeal, we could deem this argument waived. *See, e.g.*, *United States v. Burke*, 633 F.3d 984, 987 (10th Cir. 2011) (noting as to defendant's suppression challenges that "none of these arguments was presented to the district court at the suppression hearing, and they are therefore waived on appeal"). However, Mr. Windom says that the government's position is "patently incorrect." Aplt.'s Reply Br. at 1. We need not resolve this dispute: even assuming, without deciding, that Mr. Windom has not waived his scope-of-detention argument, we conclude *infra* that it fails in any event on the merits.

between statutory elements and means as the first step in the application of the categorical approach).

As noted, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Mosley*, 743 F.3d at 1329 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The safety of law enforcement is a "legitimate and weighty" concern, *Mimms*, 434 U.S. at 110; therefore, "officers may use force during a *Terry*-type detention to the extent that 'such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop.'" *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (alterations in original) (quoting *Hensley*, 469 U.S. at 235); *accord Mosley*, 743 F.3d at 1328–29.

In evaluating the reasonableness of officers' use of force we apply an objective standard, asking whether the "facts available to the officer *at the moment* of the seizure . . . [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Madrid*, 713 F.3d at 1256 (alteration in original) (emphasis added) (quoting *Terry*, 392 U.S. at 22); *see also Mosley*, 743 F.3d at 1329 (same); *cf. Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

11

Further, in evaluating officers' actions we are mindful of "'the facts and circumstances of each particular case' and give 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Hood*, 774 F.3d at 643 (quoting *Graham*, 490 U.S. at 396–97); *accord Mosley*, 743 F.3d at 1329 ("This test 'requires careful attention to the facts and circumstances of each particular case . . . .'" (quoting *Graham*, 490 U.S. at 396)). "[B]right-line rules do not govern the permissible scope of an investigative detention." *United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007). "[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

Applying these principles, we have held that, "[u]nder certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." *Novitsky*, 491 F.3d at 1254. More specifically, although we have observed that, "effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios," *Perdue*, 8 F.3d at 1463, we have rejected a bright-line rule that "the use of guns automatically turns the stop into an arrest" in favor of "the better view . . . that the use of guns in connection with a [*Terry*] stop is permissible where the police reasonably believe they are necessary for their protection," *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir.

12

1982). *Compare Hood*, 774 F.3d at 643–44 (holding that officers were justified "in drawing their firearms and ordering [the defendant] to the ground," because "[t]hey did so to protect their own safety and maintain the status quo"), *Mosley*, 743 F.3d at 1330 (concluding that an initial *Terry* stop with weapons raised was reasonable, where officers conducted the stop "in a high-crime area, at around 3:00 a.m., and [after] receiv[ing] an anonymous tip that one of the occupants of the car in which [the] [d]efendant sat had a gun in his lap"), *Copening*, 506 F.3d at 1248 (finding officers' use of "felony takedown" procedure reasonable in light of their belief that "a loaded gun—by any measure an inherently dangerous weapon—was in the [vehicle's] passenger compartment"), *and Perdue*, 8 F.3d at 1463 (finding officers justified in stopping car "[w]ith weapons drawn . . . and order[ing] [the defendant] and his fiancee to get out of the car and lie face down" based solely on their knowledge that "guns were found on the property where marijuana was being cultivated" and where the stop was made), *with United States v. Melendez-Garcia*, 28 F.3d 1046, 1050–53 (10th Cir. 1994) (holding that "felony stop" procedures were unreasonable as part of a *Terry* stop, where officers conducted the stop "on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders").

Further, the Supreme Court has repeatedly recognized the inherent danger that officers face when confronting a suspect in a vehicle. *See, e.g.*, *Mimms*, 434 U.S. at 110 (holding that police officers may order individuals to exit a vehicle during a *Terry* traffic

13

stop based in part on the "inordinate risk confronting an officer as he approaches a person seated in an automobile"); *Adams v. Williams*, 407 U.S. 143, 148 n.3 (1972) (citing a study that found "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile"); *see also United States v. Robinson*, 414 U.S. 218, 234 n.5 (1973) (noting "that a significant percentage of murders of police officers occur[] when the officers are making traffic stops").  We too have acknowledged the "dangerous dilemma" that police officers face when executing a *Terry* stop involving suspects in an automobile, especially where, as here, the officers have a reasonable suspicion that the suspect is armed.  *Merritt*, 695 F.2d at 1273 (quoting *United States v. Jackson*, 652 F.2d 244, 249 (2d Cir. 1981)).  In particular, in such circumstances, where the officers' suspicion does not rise to the level of probable cause, they face an untenable dilemma:

> If the officer approaches a suspected robber with his gun still in his holster, he increases the risk that he will be shot. If, on the other hand, he protects himself by drawing his gun, he increases the risk that a court will set the criminal free by construing his action as an illegal arrest.

*Merritt*, 695 F.2d at 1273 (quoting *Jackson*, 652 F.2d at 249–50).

Indeed, when an officer has a reasonable belief that a suspect he is investigating at close range is armed, "it would appear to be clearly *unreasonable* to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."  *Long*, 463 U.S. at 1047 (emphasis added) (quoting *Terry*, 392 U.S. at 24); *see also Perdue*, 8 F.3d at 1463 ("The Fourth

14

Amendment does not require that officers unnecessarily risk their lives when encountering a suspect whom they reasonably believe to be armed and dangerous."). Notably, we have held that "the governmental interest in the safety of police officers *outweighs* the individual's Fourth Amendment interest when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous." *United States v. King*, 990 F.2d 1552, 1561 (10th Cir. 1993) (emphasis added); *see also United States v. Holt*, 264 F.3d 1215, 1222 (10th Cir. 2001) (en banc) (Ebel, J., for the court) ("The Supreme Court has found it 'too plain for argument' that the government's interest in officer safety is 'both legitimate and weighty,' given the 'inordinate risks confronting an officer as he approaches a person seated in an automobile.'" (quoting *Mimms*, 434 U.S. at 110)), *overturned on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005) (holding that the content of police questions in the course of a legitimate stop raise no Fourth Amendment issues if the questions do not unreasonably prolong the detention).

Thus, in light of the foregoing principles, we must determine whether the totality of the circumstances known to the officers justified the nature of the particular seizure at issue here. *See Mosley*, 743 F.3d at 1328–29 ("In evaluating whether the precautionary steps taken by an officer [during a stop] were reasonable, the standard is objective—would the facts available to the officer at the *moment of the seizure* warrant a man of reasonable caution in the belief that the action taken was appropriate." (quoting *Novitsky*, 491 F.3d 1244)). We conclude that, under these circumstances, the degree of force used by the officers was reasonable and justified.

15

# 1

Putting a finer point on Mr. Windom's argument, he contends that the high-risk stop techniques the officers used in executing the stop were unreasonable given that the officers only possessed reasonable suspicion that he was guilty of a *completed misdemeanor.* In other words, he contends that, although a completed misdemeanor may give rise to reasonable suspicion sufficient to justify an ordinary investigative stop, a completed misdemeanor may not form the basis for *the use of high-risk stop techniques* because the government interest in solving past misdemeanor crimes fails to support such an intrusion on personal security.

In support of this proposition, Mr. Windom relies largely on two of our prior cases—*Moran* and *Madrid*—in which we held that a completed misdemeanor could provide reasonable suspicion sufficient to justify an investigative detention. *See Madrid*, 713 F.3d at 1257; *Moran*, 503 F.3d at 1142–43. In particular, relying on the Supreme Court's decision in *Hensley*, we held in *Moran* that past crimes—whether felony or misdemeanor—could support a stop based on less than probable cause if "reasonable in light of the particular facts and circumstances of th[e] case." 503 F.3d at 1141. Notably, we applied the rubric of *Terry*, which instructs that the reasonableness of an investigative detention, and thus its constitutionality under the Fourth Amendment, depends on the balance between the "governmental interests alleged to justify the intrusion" and "the nature and quality of the intrusion on personal security." *Id.* (quoting *Hensley*, 469 U.S. at 228); *cf. Hensley*, 469 U.S. at 228 ("The proper way to identify the limits [on

16

investigative stops to investigate *past* criminal activity] is to apply *the same test* already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes." (emphasis added)).  We concluded that the "strong governmental interest in solving crime" outweighed "the relatively limited intrusion on personal security occasioned by [a brief, non-intrusive] investigatory stop."  *Moran*, 503 F.3d at 1143; *see also Madrid*, 713 F.3d at 1258 (concluding that a stop was reasonable because "the intrusion on [Defendant's] personal security was brief and minimal, and the government had a strong interest in solving crime and ensuring public safety in the circumstances").

Mr. Windom correctly points out that, unlike the circumstances of his stop, both *Madrid* and *Moran* involved minimally intrusive, brief investigative stops.  But his reliance on *Moran* and *Madrid* is misplaced.  In both of those cases, we considered *only* whether the officers' reasonable suspicion of a completed misdemeanor was sufficient to justify an investigative stop *at its inception*, i.e., prong one of *Terry*.  *See Madrid*, 713 F.3d at 1257 ("The only issue in this appeal is whether the seizure of Mr. Madrid was justified *at its inception*." (emphasis added)); *Moran*, 503 F.3d at 1140 (considering whether a "stop . . . based on suspicion of . . . a completed misdemeanor . . . violate[s] the Fourth Amendment").  We did not have occasion in these two cases to consider the issue presented here, which relates to *Terry*'s second prong, i.e., the reasonableness of the scope of the detention.  Specifically, we did not examine in those cases under what circumstances officers' use of force in conducting an investigative detention—*after*

17

effecting a permissible initial stop—will convert the detention into an arrest that must be justified by probable cause. Therefore, *Moran* and *Madrid* are largely inapposite to resolving the question before us.

**2**

Once the officers lawfully stopped the vehicle, the government's interest in officer safety took on heightened salience. Specifically, the information that the officers possessed provided them with an objective basis to believe that Mr. Windom would be armed and dangerous.[2] Once the officers lawfully stopped the vehicle, they had reason to take steps "to protect their personal safety and to maintain the status quo during the course of the stop." *Mosley*, 743 F.3d at 1329 (quoting *Novitsky*, 491 F.3d at 1254); *accord Hensley*, 469 U.S. at 235. Although the stop was undoubtedly more intrusive than an ordinary *Terry* stop, "the precautionary measures of force employed by the officers were reasonable under the circumstances." *Perdue*, 8 F.3d at 1463. This is especially so given the "legitimate and weighty" governmental interest in officer safety. *Holt*, 264 F.3d at 1222 (quoting *Mimms*, 434 U.S. at 110).

Critically, the officers conducted the *Terry* stop in a high-crime area at around

---

[2]     The importance of the officers' need to protect their personal safety remains unchanged, even in the face of some uncertainty regarding whether they would, in fact, encounter an armed individual. Indeed, an "officer need not be absolutely certain that the individual is armed; [rather, ]the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. Here, for the reasons explicated *infra*, the officers had a reasonable basis to fear for their safety.

18

midnight, after receiving a tip that would have led a reasonable officer to believe that one of the occupants of the vehicle they had just stopped had flashed a firearm in public, *and* had also proclaimed membership in the Crips, a notoriously dangerous street gang.[3] More specifically, the confluence of these two interlocking factors would have reasonably led officers to believe that they might confront an armed and dangerous individual, *see Copening*, 506 F.3d at 1248 (describing a "loaded gun" as "an inherently dangerous weapon"); *United States v. Garcia*, 459 F.3d 1059, 1066 (10th Cir. 2006) (describing "some degree of gang affiliation" as an additional fact that supported the reasonableness of a precautionary frisk by officers), who potentially posed "an immediate threat to the[ir] safety." *Mosley*, 743 F.3d at 1329 (quoting *Graham*, 490 U.S. at 396).

Indeed, the circumstances present here are analogous to those in *Perdue*, in which we concluded that the officers were justified in conducting a *Terry* stop with weapons drawn. In *Perdue*, officers conducted a *Terry* stop similar to the one at issue here after witnessing a truck enter a long dirt road leading to a remote building that the officers knew housed weapons. 8 F.3d at 1458–59. Notably, the officers stopped the defendant's

---

[3]    *See United States v. Robinson*, 978 F.2d 1554, 1560 (10th Cir. 1992) ("Each appellant also was linked to the Crips gang, a gang formed for the main purpose of distributing crack cocaine, according to the government's uncontradicted evidence."); *see also United States v. Matthews*, 312 F.3d 652, 665 (5th Cir. 2002) (describing the Crips as "a violent criminal street gang"); *United States v. Turner*, 104 F.3d 1180, 1182–83 (9th Cir. 1997) (noting testimony of federal agent who "identified two violent street gangs, the Bloods and the Crips, as the most notorious of the gangs, deriving tremendous profits by trafficking crack cocaine to other cities and expanding their activities throughout the United States").

car "with weapons drawn" and "ordered Mr. Perdue and his fiancee to get out of the car and lie face down." *Id.* at 1458. Although the government conceded that the officers lacked probable cause for an arrest, we concluded that the *Terry* stop was "reasonable as conducted," based on the officers' knowledge that the building—which the driver *had not reached*—contained firearms. *Id.* at 1462–63. We explained that "[t]he Fourth Amendment does not require that officers unnecessarily risk their lives when encountering a suspect whom they reasonably believe to be armed and dangerous," *id.* at 1463, and concluded that police officers may "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo," *id.* at 1462 (alteration in original) (quoting *Hensley*, 469 U.S. at 235).

Given those factual circumstances, we reasoned that the officers' knowledge of the firearms found in the building justified "any concern [they] had for their personal safety," *id.* at 1463; more specifically, based on this information about the weapons, the officers could have reasonably believed that the occupants of the vehicle were armed, even though they had no certainty of this fact, and consequently were reasonable in executing their *Terry* stop with a heightened degree of force, *see id.* at 1463 & n.5. At least arguably, the reasoning of *Perdue* applies with even greater force here, where the suspect had been seen in actual possession of a firearm close to the time of the stop. In other words, firearm possession was more certain and concrete here than in *Perdue*; therefore, the justification for taking heightened protective measures was seemingly greater here than in *Perdue*.

20

Similarly, in *Copening*, we considered the reasonableness of "felony takedown" procedures virtually identical to the tactics employed here,[4] in response to an "*anonymous*" tip that a male caller had seen "a bald, African-American man . . . (1) exit a vehicle . . . [outside of a convenience store]; (2) drop a pistol [while exiting]; (3) pick up the pistol; (4) return to the vehicle; (5) 'stash' the pistol in the vehicle's seat; and (6) enter the [convenience store]." 506 F.3d at 1243 (emphasis added).

On appeal, the defendant argued—much like Mr. Windom—that these facts failed

---

[4]      In *Copening*, the officers specifically described the "felony takedown procedure" as follows:

> the officers (1) exit their cruisers, staying behind their driver's-side door, with their guns drawn; (2) obtain a view of the occupants' hands; (3) direct the driver to throw the vehicle's keys on the ground, using only their left hand; (4) order the occupants to exit the vehicle, one at a time, with their hands above their head; (5) tell the suspects to back up, i.e., facing away from the officers, toward the police cruisers; and (6) handcuff the suspects, either standing, kneeling, or in a prone position, from behind. Throughout the takedown officers keep guns fixed on both the vehicle and the suspects.

506 F.3d at 1245. These procedures are almost identical to those used by the officers in this case.

Here, the "high-risk traffic stop" procedure entailed that the officers (1) exit their cruisers, staying behind their driver's side door, R., Vol. III, at 80; (2) "spotlight" the vehicle, *id.*; (3) direct the driver to "turn the car off," and "throw the keys out [of] the driver's side window," R., Suppl. Vol. I, at 20; (4) order the occupants to exit the vehicle, one at a time, with their hands above their heads, *id.*; (5) order the suspects to assume the prone position—i.e., to lie face-down on the ground with legs crossed, *id.*; R., Vol. III, at 81; (6) handcuff the suspects and perform a pat-down for weapons, R., Suppl. Vol. I, at 57–58; and (7) throughout the procedure officers maintain "lethal cover," meaning that "they ha[ve] their guns drawn and pointed at the [vehicle], as well as its occupants," R., Vol. III, at 80.

21

to "justify officers' use of the 'felony takedown' procedure" because officers based the *Terry* stop on a "technical offense" in circumstances lacking any indication of impending "violence or threat." *Id.* at 1248. We, however, rejected these arguments, concluding that "the 'felony takedown' procedure" constituted the "appropriate 'precautionary measure,'" under the[] circumstances." *Id.* (quoting *United States v. Shareef*, 100 F.3d 1491, 1506 (10th Cir. 1996)). Those circumstances included the officers' reasonable belief that there was a "loaded gun . . . in the [vehicle]," the "safety risk attendant to detaining the truck's occupants on a suspected weapons violation," and "the 'need to detain multiple defendants.'" *Id.* (quoting *Muehler*, 544 U.S. at 100). The facts here match and even exceed those in *Copening*, insofar as the officers in *Copening* had no reason to believe that the suspect was a member of a violent gang.

Mr. Windom contends that *Perdue* and *Copening* are inapposite because they "are not completed-misdemeanor cases, and they do not apply the *Hensley* balancing test." Aplt.'s Reply Br. at 5. As we suggested *supra*, however, Mr. Windom's arguments based on the misdemeanor nature of his conduct are misguided because they pertain to the reasonableness of the *initial stop*—which undisputedly is not at issue here. Furthermore, as we have repeatedly stated, we must pay "careful attention to the facts and circumstances of each particular case" viewing them "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Mosley*, 743 F.3d at 1329 (quoting *Graham*, 490 U.S. at 396). The information known to the officers at the time of the seizure was not simply that the suspect they were pursuing had

22

committed a garden-variety misdemeanor. On the contrary, the officers had a reasonable belief that the suspect was armed and dangerous. Furthermore, Mr. Windom's contention that *Perdue* and *Copening* did not apply what he calls the "*Hensley* balancing test" is simply incorrect.[5]

---

[5] What Mr. Windom refers to as the "*Hensley* balancing test" is in fact more accurately dubbed the *Terry* balancing test. For it was the Court's decision in *Terry* that introduced the notion of a Fourth Amendment balancing test in place of the general requirement of probable cause to support a seizure. *See, e.g.*, *Place*, 462 U.S. at 703 ("The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of 'the Fourth Amendment's general proscription against unreasonable searches and seizures.'" (quoting *Terry*, 392 U.S. at 20)); *Dunaway*, 442 U.S. at 210 ("[*Terry*] defined a special category of Fourth Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test."); *cf. Novitsky*, 491 F.3d at 1253 (noting that "the Supreme Court has held that 'arrests, the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause'" (quoting *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996))).

Mr. Windom contends that our circuit "applies a different test when the only suspected crime is a past misdemeanor." Aplt.'s Opening Br. at 5; *see also* Aplt.'s Reply Br. at 4 (stating that "in completed-misdemeanor cases this Court applies the *Hensley* test, a slight variation on the *Terry* analysis for ongoing crimes and completed felonies . . . ."). However, the *Hensley* test is simply the *Terry* test, which in all cases instructs that we consider "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry*, 392 U.S. at 19. In other words, we analyze the reasonableness of an investigative seizure based on a completed misdemeanor the same way we analyze any other seizure involving less than probable cause. *See Hensley*, 469 U.S. at 228 ("The proper way to identify the limits [on investigative stops to investigate *past* criminal activity] is to apply *the same test* already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." (emphasis added)); *Moran*, 503 F.3d at 1140 ("We measure the constitutional validity of an

23

In *Perdue*, we explicitly noted that the ultimate determination of the reasonableness of a particular seizure under the Fourth Amendment "is determined by balancing the governmental interest in crime prevention against the citizen's right to be free from governmental intrusion." *Perdue*, 8 F.3d at 1462 (citing *Terry*, 392 U.S. at 20–21). We then concluded that, "[a]lthough bordering on an illegal arrest, the precautionary measures of force employed by the officers were reasonable under the circumstances." *Id.* at 1463. And, although we did not expressly reference the balancing test in *Copening*, we undoubtedly employed it in analyzing the reasonableness of the felony takedown procedures employed by officers in that case. *See Copening*, 506 F.3d at 1248 (holding that "the 'felony takedown' procedure . . . was not unnecessarily forceful or intrusive, but rather an appropriate 'precautionary measure,' under the[] circumstances" (quoting *Shareef*, 100 F.3d at 1506)). In light of *Perdue* and *Copening*, we cannot hold the officers acted unreasonably here when they seized Mr. Windom with their weapons drawn, ordering him out of the vehicle and handcuffing him for their own safety.

In sum, given the particular facts of this case, we conclude that the precautionary measures of force that the officers employed in seizing Mr. Windom were reasonable, and did not cause his seizure to rise to the level of a de facto arrest, which would have

---

investigatory stop by the standard set forth in *Terry* . . . ."); *see id.* at 1141 ("[f]ollowing the Supreme Court's approach in *Hensley*"—which is the *Terry* balancing test—when evaluating the reasonableness of an investigative stop based on a completed misdemeanor).

required a showing of probable cause.  Consequently, the seizure here was lawful.

**III**

For the foregoing reasons, we **AFFIRM** Mr. Windom's conviction.