**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 18, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AMANDA ELLSWORTH; BRAEDEN
WALLING,

     Plaintiffs - Appellants,

v.

CITY OF BROKEN ARROW,
OKLAHOMA, a municipal corporation;
JOSH ZOLLER, individually; RODNEY
GARNER, individually,

    Defendants - Appellees.

No. 20-5032
(D.C. No. 4:19-CV-00034-TCK-FHM)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT***
_____

Before **BACHARACH**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **PHILLIPS**, Circuit Judge.
_____

Plaintiffs Amanda Ellsworth and Braeden Walling appeal from the district

court's grant of summary judgment in favor of Defendants City of Broken Arrow

("the City") and Officers Josh Zoller and Rodney Garner of the Broken Arrow Police

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Department ("BAPD") on Plaintiffs' 42 U.S.C. § 1983 action. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Plaintiffs' action arose from a traffic stop of a car driven by Ms. Ellsworth. On August 1, 2018, the BAPD dispatch reported that the Tulsa Police Department ("TPD") was following a black Ford Mustang involved in an armed robbery, that the robbery involved a gun, and that a TPD helicopter was the only unit following the vehicle. Shortly after dispatch described the vehicle's location, BAPD Officer Marque Baldwin saw a black car traveling at the specified location. Officer Josh Zoller, who also saw the black vehicle, stated it looked like a Ford Mustang, but Officer Baldwin responded it looked more like a Dodge Charger.

After dispatch updated the vehicle's location and noted there were two handguns in the vehicle, Officer Zoller asked dispatch if TPD had provided a license plate number. Dispatch stated that TPD had not given that information, at which point Officer Zoller provided the license plate number of the black car and asked dispatch to confirm with the helicopter that they were behind the correct vehicle. The helicopter—which was "right above" Officer Zoller, Aplee. Supp. App. at 50— confirmed directly over the radio that he was behind the suspect vehicle. BAPD dispatch also indicated that the car was not reported as stolen.

The BAPD officers then activated their lights and sirens and pursued the black Charger driven by Ms. Ellsworth. Her seventeen-year-old daughter, plaintiff Braeden Walling, was the front seat passenger, and three young children were in the back seat.

2

After traveling an additional half mile over the course of one minute, Ms. Ellsworth pulled her vehicle over.  It was approximately 7:15 p.m.  Officer Zoller parked behind Ms. Ellsworth; Officers Garner and Baldwin parked behind Officer Zoller; and BAPD Sergeant Bryan Bandy stopped traffic further up the road.  Around this time, TPD reported the suspects were two Hispanic males.

The officers exited their vehicles, pointed their firearms at Plaintiffs' vehicle, and directed the occupants to put their hands up.  Officer Zoller first ordered Ms. Ellsworth, who is not Hispanic, out of the vehicle and directed her to walk backwards toward his vehicle.  Meanwhile, Officer Garner put his rifle in Officer Zoller's vehicle and waited for Ms. Ellsworth to get close so that he could handcuff her.  When she reached Officer Zoller's vehicle, Officer Zoller directed her to go to her knees, and Officer Garner, using one arm, grabbed her left arm, forced her to the ground, and handcuffed her.  In the process, Ms. Ellsworth sustained a bruise on her arm from the grab and bruising on her ankle from striking the curb.  Officer Garner then helped her back up and pushed her into the backseat of his vehicle.

While Officer Garner was securing Ms. Ellsworth, Officer Zoller ordered Ms. Walling, who also is not Hispanic, out of the vehicle and directed her to walk backwards.  According to Plaintiffs, Ms. Walling was handcuffed as well.  The TPD helicopter then reported that Plaintiffs were not the suspects, at which point the BAPD officers holstered their weapons, removed the handcuffs, and released Plaintiffs.  Sergeant Bandy explained to Ms. Ellsworth that they were looking for

3

robbery suspects, and she said she understood. He asked if she was okay and if she needed an ambulance, and she stated she just wanted to go home.

Plaintiffs filed suit in state court against the City, which removed the action to federal court. Plaintiffs then amended their complaint, adding Officers Zoller and Garner as defendants and alleging false arrest and excessive force in violation of 42 U.S.C. § 1983, false arrest in violation of state law, and assault and battery in violation of state law. The parties filed cross-motions for summary judgment, and the district court denied Plaintiffs' motion and granted Defendants' motion. The court concluded, *inter alia*: (1) Plaintiffs' detention was supported by reasonable suspicion and did not violate the Fourth Amendment; (2) the use of force was reasonable and did not violate the Fourth Amendment; and (3) the state-law claims failed for the same reasons as the constitutional claims. Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs argue the district court erred in granting summary judgment on their § 1983 claims for false arrest and excessive force in favor of Officers Zoller and Garner. We disagree and affirm the district court's judgment.[1]

---

[1] Plaintiffs fail to argue their state-law claims, so those claims are waived. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1049 n.1 (10th Cir. 2008) ("Arguments inadequately briefed in the opening brief are waived."). Plaintiffs also fail to adequately brief their § 1983 claims against the City. They argue BAPD has a "policy of arrest first and ask questions and investigate later," which "should have caused [Defendants'] summary judgment motions to be denied and [Plaintiffs'] motion to be granted." Aplt. Opening Br. at 12. But they offer no citation for such a proposition. Instead, for municipality liability under § 1983, a plaintiff must show (1) a "policy or custom" (2) "that caused the injury" and (3) "was enacted or maintained with deliberate indifference to an

4

## I.      Standard of Review

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968 (10th Cir. 2017) (internal quotation marks omitted). "Summary judgment shall be granted if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute must be based on more than "[u]nsubstantiated allegations" or "mere speculation, conjecture, or surmise." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (internal quotation marks omitted).

---

almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal quotation marks omitted). And the analysis is even more exacting with "a claim against a municipality for failure to train its police officers in the use of force." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (internal quotation marks omitted) (listing five factors a plaintiff must show). Plaintiffs allege BAPD's policy is "unconstitutional," Aplt. Opening Br. at 17, and "directly caused" their claim, *id.* at 29. But they do not cite, let alone apply, authority relevant to municipality liability, and their contentions regarding the City are too conclusory to merit review, *see Acosta v. Foreclosure Connection, Inc.*, 903 F.3d 1132, 1136 n.1 (10th Cir. 2018). In any event, their claims against the City fail for the same reasons noted below:  the failure to show a constitutional violation.

5

## II.     False Arrest

Plaintiffs first contend they were arrested without probable cause in violation of the Fourth Amendment.  We conclude the undisputed facts show their seizure was not an arrest but a lawful investigative detention.

In evaluating a seizure, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *United States v. Windom*, 863 F.3d 1322, 1327 (10th Cir. 2017) (brackets and internal quotation marks omitted).  Although a seizure generally requires probable cause, the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), "recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security . . . based on less than probable cause."  *Windom*, 863 F.3d at 1327 (internal quotation marks omitted).  Under *Terry*, an investigative detention only requires reasonable suspicion.  *See Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc).  But "if a police-citizen encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest that must be supported by probable cause."  *United States v. Chavez*, 660 F.3d 1215, 1223 (10th Cir. 2011) (brackets and internal quotation marks omitted).  Accordingly, we consider:  (1) "whether the stop was justified at its inception"; and (2) "whether the officers' actions were reasonably related in scope to the circumstances which justified the interference in the first place."  *Windom*, 863 F.3d at 1328 (brackets and internal quotation marks omitted).

6

**A. The Initial Stop of Plaintiffs' Vehicle**

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Id.* (internal quotation marks omitted). The undisputed facts show that the initial stop of Plaintiffs' vehicle was supported by reasonable suspicion.

Officers Zoller and Garner were told that TPD was pursuing a "black Ford Mustang that was involved in an armed robbery in [Tulsa]," that a TPD helicopter was the only TPD unit following the vehicle, and that there were "two handguns in the vehicle." Aplt. App. at 93-94. After TPD relayed the vehicle's location, the BAPD officers saw a black vehicle at that location. Officer Zoller thought it looked like a Ford Mustang, but Officer Baldwin believed it looked more like a Dodge Charger. Although Plaintiffs suggest the officers dismissed this discrepancy, Officer Zoller sought further information specifically "to ensure that [he] was going to initiate a traffic stop on the correct car." Aplee. Supp. App. at 48.[2] He first asked dispatch if TPD had provided a license plate number. And when dispatch said TPD had not given that information, he provided Plaintiffs' license plate number and asked for the helicopter to confirm he was following the right car.

---

[2] Plaintiffs also note TPD described the suspect vehicle as having "rust on it" and that their car had "no rust." Aplt. Opening Br. at 2-3. But it is undisputed the officers were not told this detail until after Plaintiffs were released. *See* Aplee. Supp. App. at 49 (Officer Zoller's deposition); *id.* at 77 (Officer Garner's deposition); *id.* at 153 (computer-aided dispatch report). And even if they knew of this discrepancy prior to the stop, TPD still confirmed Plaintiffs' vehicle was the suspect vehicle.

7

Once the TPD helicopter confirmed the officers were following the suspect vehicle, they were entitled to rely on that information. *See Oliver v. Woods*, 209 F.3d 1179, 1190-91 (10th Cir. 2000) (noting that "officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information" and, instead, may "rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention" (internal quotation marks omitted)). And the officers' reliance on TPD's information, albeit mistaken, was reasonable. *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) ("A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." (internal quotation marks omitted)).

Although Plaintiffs were "admittedly innocent," Aplt. Opening Br. at 2, "*Terry* accepts the risk that officers may stop innocent people," *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). We hold Plaintiffs' *Terry* stop was justified at its inception.

**B. The Officers' Conduct After Stopping Plaintiffs' Vehicle**

We next consider "whether the officers' conduct was such as to place the seizure within the general rule requiring probable cause for a seizure or within *Terry*'s exception to that rule." *Windom*, 863 F.3d at 1328 (brackets, ellipsis, emphasis and internal quotation marks omitted). Plaintiffs contend that by pointing guns at them and their car, forcing Ms. Ellsworth to the ground, and placing them in

8

handcuffs,[3] all pursuant to a "point guns/arrest first/ask questions later policy,"[4] Aplt. Opening Br. at 26, the officers' conduct converted the seizure into an arrest requiring probable cause. We conclude the undisputed facts show the officers' actions after stopping the vehicle were reasonable and did not convert the seizure into an arrest.

First, Plaintiffs argue that "[t]he use of firearms and handcuffs is an arrest, not an investigative detention." *Id.* at 25. But the cases they cite do not support such a blanket proposition. *See Cortez*, 478 F.3d at 1115-16 ("The use of firearms, handcuffs, and other forceful techniques *generally* exceed the scope of an investigative detention and enter the realm of an arrest." (brackets and internal quotation marks omitted) (emphasis added)); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) (holding the display of weapons and use of handcuffs exceeded the scope of the *Terry* stop because, *inter alia*, there was no

---

[3] Although Defendants insist Ms. Walling was never handcuffed, and Plaintiffs have not identified which officer allegedly handcuffed her, we must view the facts in the light most favorable to the non-movant. We therefore accept, solely for purposes of our analysis, that both Plaintiffs were handcuffed.

[4] Plaintiffs appear to mischaracterize testimony from Captain Greg Sipes, who testified that BAPD officers are taught "*[t]here are times*" when they "could be on a scene where everyone needs to be handcuffed for officer safety." Aplee. Supp. App. at 129 (emphasis added); *see also id.* (acknowledging that, "*[d]epending on the circumstances*," BAPD "officers are taught that if they come upon a scene where they think . . . a crime occurred and they've got a bunch of people there that they don't know what they've done . . . they can handcuff them first and sort the facts out later" (emphasis added)). Captain Sipes clarified "[t]hat doesn't mean those people are under arrest," only that "they're detained so an officer can control the scene and make sure they're safe and to further the investigation." *Id.* There is simply no evidence of an "'arrest first and investigate facts later' policy," Aplt. Opening Br. at 2, let alone a "shoot first and ask questions later policy," Aplt. Reply Br. at 15.

information "the suspects were armed or violent").  Instead of "rigid criteria," "common sense and ordinary human experience" guide our analysis of the reasonableness of *Terry* stops.  *Windom*, 863 F.3d at 1329 (internal quotation marks omitted).  Therefore, "under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground."  *Id.* at 1329-30 (brackets and internal quotation marks omitted); *see also id.* at 1330 (collecting cases); *Shareef*, 100 F.3d at 1506 (holding such measures did not convert a *Terry* stop into an arrest).[5]

Here, the BAPD "officers' use of high-risk stop techniques was reasonable under the circumstances."  *Windom*, 863 F.3d at 1328.  With the information relayed by dispatch and provided directly by the TPD helicopter, the officers reasonably believed the black vehicle they were following (1) was involved in an armed robbery,

---

[5] Plaintiffs dismiss the issue of officer safety, stating Officer Zoller's concern about not "want[ing] to get shot and just want[ing] to get home to his family" does not factor into the analysis.  Aplt. Opening Br. at 26.  But "police officers need not take unnecessary risks in the line of duty" and "may take precautionary measures"— including felony-takedown procedures, as used here—"that are reasonably necessary to safeguard their personal safety, and to maintain the status quo, during a *Terry* stop."  *United States v. Copening*, 506 F.3d 1241, 1248 (10th Cir. 2007) (internal quotation marks omitted); *see also Windom*, 863 F.3d at 1331 ("[W]hen an officer has a reasonable belief that a suspect he is investigating at close range is armed, it would appear to be clearly *unreasonable* to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (internal quotation marks omitted)).

and (2) contained two suspects and two handguns. The officers thus were fully justified in pointing their guns at Plaintiffs' vehicle and ordering the occupants out.

Plaintiffs however insist that once they exited the vehicle, if not before when they placed their hands outside the vehicle's windows, BAPD officers should have been able to tell they were not Hispanic males and, therefore, not the armed robbery suspects. Plaintiffs also argue they were cooperative during the stop and at all times compliant with the officers' directions. Plaintiffs thus contend the objective facts caused any suspicion supporting the stop to "dissipate." Aplt. Opening Br. at 12.

The undisputed facts show that Plaintiffs were compliant and that the officers immediately saw Ms. Ellsworth "was not a Hispanic male." Aplee. Supp. App. at 85. But it is also undisputed the officers could not determine either what Plaintiffs had been "doing inside the vehicle" immediately prior to the stop, *id.* at 84, or whether Plaintiffs were unarmed solely based on their appearance. Both officers testified they could not confirm whether Plaintiffs were unarmed until they were physically secured and placed in custody. *Id.* at 66, 82. The officers also could not tell whether the suspects—two Hispanic males—were hiding in the backseat. Officer Zoller testified he "could not tell who the occupants were when [he] made the stop," *id.* at 66, and "couldn't even see the children," *id.* at 53. And according to Ms. Walling, one officer specifically asked her whether there were "any Hispanics in the car" and "seemed shocked" when she said there were three children in the backseat. Aplt.

11

App. at 74. Another officer then walked to over the vehicle and confirmed there were "kids in the back." *Id.*[6]

Having been told the vehicle contained two armed robbery suspects and two handguns, the officers kept their firearms trained on the vehicle as they began removing the occupants one at a time, placing them in handcuffs, and separating them so that the officers could secure the scene and investigate further. *See Shareef*, 100 F.3d at 1507 ("The use of handcuffs was justified until all six defendants were secured, and for a reasonable time thereafter, while the officers conducted protective sweeps of the cars and assessed the situation."); *see also Muehler v. Mena*, 544 U.S. 93, 100 (2005) (permitting handcuffs in high-risk situations and noting generally the increased risk in stopping a vehicle with multiple occupants). Plaintiffs were not told they were under arrest or advised of their *Miranda* rights. *See Cortez*, 478 F.3d at 1123 (referencing the lack of *Miranda* rights, among other factors, in determining a seizure was a *Terry* stop and not an arrest). And they were released as soon as TPD said they were not the suspects, with the entire encounter lasting about three minutes.

---

[6] The parties dispute whether the officers learned the suspects were Hispanic males before the stop—according to Plaintiffs—or after the stop and while Plaintiffs were being handcuffed—according to the officers and as found by the district court. This dispute is not material. The officers either did not know the suspects' gender and ethnicity prior to the stop—in which case they could have believed Plaintiffs were the suspects—or they knew Plaintiffs did not match the suspects' description—in which case they could still have believed the suspects were hiding in the car. Either way, the officers' actions "were reasonably related in scope to the circumstances which justified the [stop] in the first place." *Windom*, 863 F.3d at 1328 (brackets and internal quotation marks omitted).

To the extent Plaintiffs contend Officer Garner's use of force transformed the "*Terry* detention into an arrest requiring probable cause," *id.* at 1130 (internal quotation marks omitted), their argument is factually and legally unsupported. Although they allege Officer Garner slammed Ms. Ellsworth to the concrete after handcuffing her, the undisputed evidence shows that he forced her onto her knees and *then* handcuffed her.[7] And although Plaintiffs allege Officer Garner "picked [Ms. Ellsworth] up and threw her into the back seat of one of the police cars," Aplt. Opening Br. at 10, she testified he did *not* pick her up and, instead, "pushed" her into the car. Aplt. App. at 62. Plaintiffs have not cited any authority showing such force altered the character of the *Terry* stop, and mindful of the high-risk nature of this stop, we conclude such force did not render the detention an arrest. *See generally Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (noting officers need not "use the least intrusive means" during an investigative detention).

---

[7] Regarding the order of events, Ms. Ellsworth testified she was handcuffed *after* being forced to the ground. *See* Aplt. App. at 62. Officer Garner also testified she was "[o]n her knees" when he handcuffed her. Aplee. Supp. App. at 87. Although Plaintiffs alleged in their complaint that Officer Garner "jamm[ed] her down on the curb after she was handcuffed," *id.* at 23, the complaint was not verified and is not competent evidence for summary-judgment purposes, *see United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 958 (10th Cir. 2008). As for the amount of force that Officer Garner used, Ms. Ellsworth testified he "slam[med]" her to her knees and "slammed [her] down to where [her] ankle hit the curb." Aplt. App. at 62. But she also testified he grabbed her with only one arm and "just forced [her] down." *Id.* We need not finely parse her words because even in the light most favorable to Plaintiffs, such use of physical force did not transform the detention into an arrest.

13

Although Plaintiffs' detention "was undoubtedly more intrusive than an ordinary *Terry* stop, the precautionary measures of force employed by the officers were reasonable under the circumstances." *Windom*, 863 F.3d at 1333 (internal quotation marks omitted). And because "the officers' actions were reasonably related in scope to the circumstances which justified the [stop] in the first place," the stop did not develop into an arrest.[8] *Id.* at 1328 (brackets and internal quotations marks omitted). The district court properly granted summary judgment to Officers Zoller and Garner on Plaintiffs' false-arrest claim.

## III. Excessive Force

Plaintiffs next contend the district court erred in granting summary judgment to Officers Zoller and Garner on their excessive-force claim. We conclude the undisputed facts show the officers used reasonable force under the circumstances.

The authority to conduct a *Terry* stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Cortez*, 478 F.3d at 1125 (internal quotation marks omitted). And that force need not be "the least intrusive." *Marquez*, 399 F.3d at 1222 (internal quotation marks omitted). Rather, we assess the force for "objective reasonableness" under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989) (internal quotation marks omitted.

---

[8] Although Plaintiffs also point to testimony from Officer Zoller indicating he believed the use of handcuffs meant Ms. Ellsworth was arrested, *see* Aplt. Opening Br. at 9, Officer Garner testified she "was being detained" and "wasn't arrested," Aplee. Supp. App. at 85. In any event, their "subjective beliefs are irrelevant" for deciding whether Plaintiffs were arrested. *Cortez*, 478 F.3d at 1117 n.8.

This standard recognizes "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (citation and internal quotation marks omitted). Ultimately, we must consider, from the perspective "of a reasonable officer on the scene," whether the force was reasonable in light of "the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest." *Marquez*, 399 F.3d at 1220 (internal quotation marks omitted).

Plaintiffs base their claim on the evidence that: (1) the officers pointed their firearms at them and their vehicle; (2) Officer Garner grabbed, with one arm, Ms. Ellsworth's arm and forced or "slammed" her down to her knees; (3) the officers handcuffed Plaintiffs; and (4) Officer Garner pushed Ms. Ellsworth into the police car. But as we held above, these actions were reasonably warranted in furtherance of the investigative detention under the circumstances. *See also Windom*, 863 F.3d at 1329-30 (noting that, depending on the circumstances, officers may protect themselves during a *Terry* stop by "drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground" (internal quotation marks omitted)); *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995) (holding the officers did not use excessive force by "shoving [an innocent bystander] to the floor, drawing a weapon on her, and handcuffing her" (brackets and internal quotation

15

marks omitted)); *United States v. Perdue*, 8 F.3d 1455, 1462-63 & n.5 (10th Cir. 1993) (holding it was reasonable for officers conducting a *Terry* stop to have their weapons drawn and to order the suspect onto the ground where they reasonably believed he was armed and dangerous, noting an "officer need not be absolutely certain that the individual is armed," only reasonably justified in being concerned for his safety or the safety of others (internal quotation marks omitted)).

In any event, we conclude the force was not excessive when considering "the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest." *Marquez*, 399 F.3d at 1220. The third factor weighs in Plaintiffs' favor, as the undisputed facts show they were cooperative and did not resist the officers. But the other two factors plainly weigh in the officers' favor—an armed robbery is a severe offense, and the possibility of multiple armed robbery suspects and multiple handguns posed a significant risk to the officers' safety. The force therefore was reasonable, particularly given the "tense, uncertain, and rapidly evolving" situation. *Graham*, 490 U.S. at 397. Thus, the district court properly granted summary judgment to Officers Zoller and Garner on Plaintiffs' excessive-force claim.[9]

---

[9] Plaintiffs' excessive-force claim based on the handcuffing also fails due to the lack of a "non-de minimis actual injury." *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020) (internal quotation marks omitted). Ms. Walling suffered no injury from the handcuffs, and Ms. Ellsworth sustained only minor abrasions or bruises, which is insufficient as a matter of law, *see id.* (collecting cases).

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court

Gregory A. Phillips
Circuit Judge